578 So.2d 580 (1990)
Michael L. RETZER
v.
Nancy B. RETZER.
No. 89-CA-0589.
Supreme Court of Mississippi.
December 12, 1990.
Rehearing Denied May 3, 1991.
Lester F. Sumners, Sumners Carter Trout & McMillin, New Albany, for appellant.
H.L. Merideth, Jr., Greenville, for appellee.
*581 En Banc.
HAWKINS, Presiding Justice, for the Court:
Michael L. Retzer was granted a divorce from Nancy B. Retzer in the chancery court of Washington County on the ground of adultery. He has appealed the chancery court award unto his wife of a cash award of $275,000, periodic alimony in the amount of $88,000 per year and custody of their children. We reverse and render on the lump sum award, and affirm on the award of custody. We affirm the annual award of $88,000 per year, not as alimony, however, but as a fair return on Mrs. Retzer's ownership of 1,600 shares in Retzer and Retzer, Inc., a close corporation in which Mr. Retzer is the majority shareholder.

FACTS
Michael L. Retzer and Nancy B. Retzer married in Louisiana December 19, 1970. He was a captain in the Air Force who shortly thereafter left the service and went to work for Texas Instruments in Houston, Texas. Mrs. Retzer received a bachelor of science degree in elementary education from Louisiana State University in January, 1971. The couple moved to Greenville, where Mrs. Retzer taught in the public school system. She was actively occupied as a teacher for the months of March-May, September-December, 1971, and all 1972. They moved to Greenville to secure a McDonald's corporation franchise and open a restaurant there. They rented an apartment; Mr. Retzer returned to work in Houston while she taught school. Later he moved to Greenville and was a substitute teacher in addition to regular employment.
According to Mr. Retzer, McDonald's corporation required more than an investor for a local franchise. The corporation wanted to assure itself the applicant could successfully operate one of its restaurants. He was required to work free for a thousand hours in McDonald's places of business and attend several training schools.
Mr. Retzer filed a financial statement with Sunburst Bank (formerly Grenada Bank) dated July 1, 1972, in support of a requested loan. It lists $44,200 cash assets. He testified approximately $25,000 of this sum were his savings, and another $20,000 a loan from his parents. This statement shows annual salaries of Mr. and Mrs. Retzer to be, respectively, $13,200 and $7,100. The Retzers secured a $65,000 loan from the First National Bank of Greenville in January, 1973, with both signing the note.
A McDonald's franchise, called a "License Agreement," runs for a 20-year term. The agreement also provides that during the last three years of the term, McDonald's may decide whether to extend the franchise for another 20-year period. On November 22, 1972, a License Agreement was executed by the licensor corporation, and "Michael L. Retzer and Nancy B. Retzer" as licensees.
At trial there was a disagreement as to Mrs. Retzer's initial investment. According to her, all of her teacher's salary went into a joint savings account and was part of the cash assets used to invest in the business. If so, it would have amounted to somewhere between $10,000 and $14,000. Mrs. Retzer brought no cash into the marriage. Mr. Retzer, on the other hand, testified Mrs. Retzer always spent beyond their means, and none of her funds went into the business. The 1972 financial statement contains no entry showing assets in a savings account. However, the $44,200 cash assets listed could have included a savings account.
When the business opened in 1972, Mr. Retzer was the manager, with two assistant managers, and testified he worked eighteen hours a day. Mrs. Retzer helped for several weeks, but returned to her teaching. She later did advise as to the interior decoration and employees' uniforms. Also, at one time she attempted to help settle a strike. Except for what has been noted, the entire management and operation of the business was by Mr. Retzer.
The business was quite successful. A second license agreement was obtained May 8, 1974, for a restaurant in Greenwood, with both Retzers as licensees. A third license agreement was obtained October *582 2, 1974, for a restaurant in Clarksdale. On April 15, 1976, Mr. Retzer obtained another license agreement in his name for a restaurant in Cleveland. On October 10, 1978, there was another license agreement for a restaurant in Indianola. In 1973 Retzer and Retzer, Inc., a Mississippi corporation, was organized, and Mr. and Mrs. Retzer were each issued 1,600 shares. All of these license agreements were assigned to this corporation, making it the owner of the five restaurants.
On April 14, 1983, Mr. Retzer obtained a license agreement in his own name for a restaurant in Yazoo City, and finally on January 21, 1985, a license agreement for a second McDonald's restaurant in Greenville. The ownership of these two licenses and restaurants remained solely in the name of Mr. Retzer. At the time of their separation, there were five restaurants owned by the corporation, two by Mr. Retzer.
A daughter, Kathryn Reed Retzer, was born to their marriage July 1, 1976. In 1975 during her pregnancy, Mrs. Retzer developed choriocarcinoma, a rare cancer associated with pregnancy, from which she fully recovered.
Mr. Retzer began operating a sole proprietorship business in his own name as "Retco" in 1979. It started as a leasing operation of two trucks. Because of tax credits and a lower unemployment rate, Retco also employed personnel for the restaurants. Mr. Retzer drew a salary from Retco, but testified no Retzer and Retzer corporate assets of any kind were diverted to him or Retco, and that it was advantageous to the corporation to operate in this manner.
On September 29, 1982, their second child, Michael Lynn, was born.

ANTE 1979 INFIDELITIES
In 1978 a remark by Mrs. Retzer that Mr. Retzer's attorney was not his friend, and his own suspicion that there might be something going on between the attorney and Mrs. Retzer, caused Mr. Retzer to change attorneys.
Mrs. Retzer also learned from her next door neighbor in 1979 that Mr. Retzer had engaged in a sexual affair with her. Mrs. Retzer confronted him and he admitted it was true, and agreed to give Mrs. Retzer a divorce, to be obtained on the ground of irreconcilable differences. Also, Mr. Retzer had made extra-marital advances to at least two other women who did not reciprocate.
In July, 1979, while their divorce was pending, Mr. Retzer caught Mrs. Retzer and his former attorney in a motel room in Jackson.
The couple returned to Greenville that night. Following soul searching discussions lasting several weeks, they agreed to resume the marriage, both, however, solemnly promising to be faithful thereafter.

LATER DEVELOPMENTS
A planned assignation between Mrs. Retzer and the attorney in an Atlanta hotel in the summer of 1981 was suspected and discovered by Mr. Retzer.
According to him, his problems with his wife were not restricted to extra-marital relations. From the beginning of their marriage, she was an exorbitant spender. Mrs. Retzer was an only child. Also, when there were serious arguments about their marital problems, Mrs. Retzer would threaten to destroy or liquidate their business.
After the Atlanta incident, each retained separate legal counsel. But again, the two decided to remain married, this time, however, with three preconditions by Mr. Retzer.
Mrs. Retzer was to stop seeing her lawyer boyfriend. Second, she was to get her spending under control. Finally, the corporation was to issue Mr. Retzer ten additional shares so as to make him a majority shareholder and give him corporate control. Mrs. Retzer's attorney (who was not the boyfriend) advised her against agreeing to the issuance of ten shares to Mr. Retzer. Despite this advice, she executed all documents prepared by Wayne Drinkwater, a Greenville attorney, necessary to issue Mr. Retzer ten corporate shares. Drinkwater neither attempted to advise nor represent either party, but simply to prepare the necessary instruments to issue the shares.
*583 Mr. Retzer also agreed, following this, that in the event the two were still married ten years thereafter, July 10, 1991, he would convey unto her whatever stock was necessary for each to own fifty percent of the stock. Drinkwater prepared this agreement by Mr. Retzer as well.
Mrs. Retzer's involvement with her boy friend, by their own chancery court admissions, resumed the last of 1984 or early 1985.[1] They had assignations at a selected house on Highway 82 and at Lake Ferguson in Washington County, in Louisiana, and in Arkansas. The boy friend admitted also to having seen her in Vicksburg and Memphis. Both said the affair would flare up, and then die down, but the boy friend said there was no way he could answer how many times he had seen Mrs. Retzer.
The two had code telephone signals whereby planned meetings could be held. Affectionate greeting card exchanges were made. Mr. Retzer found the boy friend's Virginia Military Institute ring in Mrs. Retzer's jewelry box.
Mr. Retzer again suspected infidelity on the part of Mrs. Retzer during this period. For one thing, his suspicion was aroused concerning her greeting cards. Mrs. Retzer kept a copious card supply in stock to have on hand to mail to various friends and acquaintances upon the appropriate occasion. Mr. Retzer noticed among this inventory cards of a clearly sexually suggestive interest by its sender. Her possession of them did not cause him any concern. The fact he was never the recipient of a single one did. He removed and photostated some and replaced them.
For whomever they were meant, however, the local boy friend at trial denied having received these particular cards.
Mr. Retzer eventually hired a private investigator, and in 1986 when he saw the boy friend at a social function, he told him not to talk to "Nancy" again, and the boy friend agreed.
In May, 1987, the attorney's secretary rented a house in Benoit, about 25 miles from Greenville, which Mrs. Retzer furnished and decorated. Tables, chairs, sofa and lamps costing $593.60, baskets, pictures, including an original watercolor costing $397.50 were installed. Mrs. Retzer took draperies from their residence, and then had a headboard cover and bedspread and pillow shams of matching material sewed for the house. She admitted spending over $2,700 on furnishings, of which $814 was charged to the corporation. Also, Mrs. Retzer carried pots and dishware, towels and linens from their residence, together with some of Mr. Retzer's private wine stock. The boy friend had a few personal items in the house.
On July 13, 1987, the investigator reported the house to Mr. Retzer, who went to it, and discovered familiar items of personal property. Also in the house were two pornographic magazines, but Mrs. Retzer and the boy friend denied knowledge of these. The Retzers separated that day.
While perhaps attempting to minimize the number of their occurrences, both Mrs. Retzer and the boy friend testified to acts of adultery continuing over a span of several years. Mrs. Retzer's only reason or excuse for her assignations was her testimony at trial that she and Mr. Retzer made a deal in 1982 for them both to "discreetly" carry on extra-marital intercourse. In 1982 when Mrs. Retzer was pregnant, an irate male employee of the Greenwood restaurant telephoned their home and told Mr. Retzer to leave his girl friend alone. At trial this young lady, who in 1982 had been an employee of the Greenwood business, testified Mr. Retzer had made a sexual proposition to her, indeed suggested that she be his mistress. Following this telephone call from the young man, according to Mrs. Retzer, she was told by her husband that they were both attractive and well off, and no doubt would receive any number of offers to sexual engagement. They should each feel free to do so, so long as there would be no public knowledge, and only the two of them knew of any such activity.
Mr. Retzer denied ever having made any sexual advance to the young lady in Greenwood, *584 and denied making any agreement for adultery with Mrs. Retzer. He did admit to receiving the telephone call from the young man, who he said was drunk, and according to Mr. Retzer, he told him never to call him again.
With the exception of Mrs. Retzer's charge that Mr. Retzer had propositioned the young lady in Greenwood, the only evidence in the record that Mr. Retzer behaved in any way improperly from the time of their reconciliation in 1979 until they separated in July, 1987, was in the summer of 1982. She testified she noticed at the time his penis was "bruised." Mr. Retzer denied this.
On September 11 Mr. Retzer filed a complaint for divorce upon the ground of adultery and irreconcilable differences, and sought custody of the children. Mrs. Retzer filed an answer denying his ground for divorce, and a complaint for separate support and maintenance, custody of the children, an accounting, and an award of one-half of his assets.

THE RETZER LIFESTYLE
Mr. Retzer's management of the restaurants was quite successful. With less than $30,000 in 1971, the business had grown and flourished, and they were quite wealthy in 1988. The second restaurant in Greenville at the time of trial had been a consistent money loser, and another, the Clarksdale restaurant, was marginal, but the others highly successful. As above noted there were seven restaurants in told.[2] The chancellor in his September 7, 1988, opinion estimated that the net worth of them both, consisting mainly of the value of the restaurants, was $4,100,000. He found that of this figure Mrs. Retzer had a net worth of $1,100,000, consisting almost entirely of the value of her corporate shares in Retzer and Retzer, Inc., and Mr. Retzer had a net worth of $3,000,000.
To get some concept of the part each of them played in the accumulation of these assets, it is necessary to examine their lifestyle. As above noted, Mrs. Retzer did not teach after 1972, and took no part in the business. Although Mr. Retzer testified she had no money whatever in the original investment and that she had consistently spent and overspent everything she made, it is possible several thousand dollars of her teacher's salary was initially invested in the first restaurant. Also, the banks for several years at least required her signature along with his on all loans.
According to Mr. Retzer, from the beginning Mrs. Retzer was continually in "financial distress." It was a "constant irritant and dilemma in our marriage." (Vol. V, 249). He discussed the problem with his attorney in 1975. In their 1979 divorce he was shown a list of bills totaling $26,300, one being a $5,500 note to a local bank, of which he knew nothing, and was called upon to pay.
They each had separate personal bank accounts. For the years 1980-87 the corporation paid each the following salaries and bonuses:

 YEAR MR. RETZER MRS. RETZER
 1980 $ 187,423.20 $ 16,350.00
 1981 $ 190,823.20 $ 18,800.00
 1982 $ 204,436.00 $ 20,775.00
 1983 $ 231,377.00 $ 21,596.00
 1984 $ 260.540.00 $ 21,590.00
 1985 $ 279,077.00 $ 21,591.00
 1986 $ 224,539.00 $ 21,610.00
 1987 $ 233,769.24 $ 33,611.20
 _____________ ___________
 TOTAL $1,811,984.64 $175,923.20

*585 Also for 1980-86 their joint income tax returns showed the following:

 Gross Taxable Federal State
 Income Income Tax Tax
 1980 $195,637 $172,534 $ 63,030 $ 6,280
 1981 $212,816 $137,508 $ 50,068 $ 8,234
 1982 $264,494 $196,633 $ 15,912 $ 4,774
 1983 $599,398 $543,984 $110,639 $26,583
 1984 $642,266 $117,445 $117,445 $22,005
 1985 $460,229 $389,283 $ 76,449 $12,714
 1986 $445,595 $393,695 $ 84,887 $18,170

Mr. Retzer's testimony as to her uncontrolled spending and incurring debts was essentially uncontradicted. He had given her over $40,000 worth of jewelry himself during the marriage. She had bills for dresses from all over the country, many costing more than $3,000. Typically, she would incur a large bill, pay something like $100 month for six to eight months, and then the "crunch" would come. (Vol. VI, 658) She had personal notes at several banks in Greenville. He expressed exasperation that the banks made loans to her freely. Her checking account in Planters Bank was constantly overdrawn.
He related a 1985 example of this chronic problem, which she conceded was accurate. Mr. Retzer was on the board of directors of Planters Bank, and every month at the board meeting the names of overdrawn depositors and amounts would be called out. To avoid embarrassing him, an officer at the bank would call him prior to each meeting, inform him of the overdraft that month, and Mr. Retzer would pay the overdraft. During that year the bank officer called him and told him that Mrs. Retzer's account was $4,700 overdrawn. He told the banker to let the checks bounce.
When the checks bounced, Mrs. Retzer came to the office and "threw a fit." She "broke valuable porcelain" and a "Picasso plate." (Vol. VI, 659) He called the pastor to calm her down. Upon Mrs. Retzer's promise never to stray again, he paid off the overdraft. "The woman needs no encouragement to spend vast sums of money." (Vol. VIII, 1138)
Mr. Retzer described the problem during cross-examination:
Q. Mr. Retzer, with your proven business ability, are you telling this Court that there was not any way that you could close accounts, take credit cards, give notice to people that extend credit, to keep Mrs. Retzer from spending sums of money like that?
A. Mr. Merideth, I want to tell you that I tried every system, every permutation of system under the sun to control Mrs. Retzer. Had her on a cash basis, had her on no credit cards, had her write a letter to every account in town closing the account. I did everything short of taking out a full page ad in the DDT telling people I would not be responsible for my wife's debts, yet every merchant in town when she walks in will accept her signature and let her carry out anything. As you have clearly seen, every banker in town will lend her large amounts on her signature without financial statements. Not even a court order, Mr. Merideth, can restrain her spending and what *586 is the penalty for me when she starts bouncing things and her credit goes bad? I get rejections from people on credit. I get credit card rejections. My credit goes bad. This happened in '84 and since that time I've made sure that Mrs. Retzer and I never had a joint account again, but that's the punishment for me, Mr. Merideth, and the answer to your question  I never developed a system to control her.
Q. You certainly could have closed her credit at the Planters Bank  you're a director there?
A. No, sir, she went in and got it on her own. I did not instruct the Planters Bank not to loan to customers, and she had it before I knew about it.
Q. She had it before you knew about it?
A. Um-hm (affirmative response).
Q. You could have told Chuck do not lend my wife anymore money on that board and he would not have loaned her anymore money.
A. She had it before I knew about it. That loan is several years old and the only thing that gets paid on it is interest.
Q. She's gone back since then and borrowed more at Planters, hasn't she?
A. I don't know. She probably has. She's borrowed everywhere else in town, Mr. Merideth.
(Vol. VI, 660-661)
Mr. Retzer testified that of the salaries and bonuses each received from the corporation it was their initial intention for Mrs. Retzer to pay for the groceries and children's clothes out of her compensation, and he would pay all their other expenses from his salary and bonus, including mortgage payment, interest, insurance, taxes. Then, at the end of the year they would split what was left. Because of her spending this did not work out (Vol. VIII, 1140), he claiming she spent $35-40 thousand each year on dresses alone.
Why this did not work out, and her spending problem can be illustrated by Exhibit 37 (Vol. V, 442) and their financial difficulty in March, 1987.
This exhibit, among other things, shows that in 1986 the total sum spent for groceries was $11,646.35, and total sum spent for children, including their clothes, was $5,307.08, totaling $16,953.43. Mrs. Retzer's personal income from the corporation that year was $21,600, leaving her a balance of $4,656.67.
As above noted, the total income of them both from the corporation for the year 1986 was $256,227.30. That year she wrote checks from her account totaling $72,327.30. Of this she spent $40,574 on personal items for herself, another $10,599.59 went into a small business venture between Mrs. Retzer and a friend, called "Fantasy." Mr. Retzer deposited $36,009.67 from his account to hers. That year Mr. Retzer expended $47,162.72 from his account, of which $18,825.48 was for personal items for himself, the remainder in investment, with the exception of a $1,100 political contribution. The expenditures that year which could be classified as expenses for them both totaled $145,463.21.
In March, 1987, Mrs. Retzer was upset with what she claimed were approximately $27,000 overdue bills. At that time they were in something of a financial bind, and in order to pay these bills, Mr. Retzer agreed to go on her note at a bank for $27,000. Once the loan had been made, Mrs. Retzer informed him of another $8,000 in bills she had forgotten, and the corporation thereupon gave her a bonus of $12,000.
On May 12, 1987, Mrs. Retzer personally borrowed $5,407 from the local Trustmark Bank, and on June 29 borrowed $6,000 from Magnolia Federal in Greenville to "completely finish" paying off her debts. (Vol. III, 103) In August and September, 1987, she obtained loans totaling $17,500 from the local Sunburst Bank and in November her mother let her have $13,000. Finally, in January, 1988, she borrowed another $5,000 from Sunburst. She said she *587 secured $57,000 in loans to pay off her debts.
She never purchased any stocks or bonds, or had a savings account.
In the first six months of 1987, Mr. Retzer spent $38,840.43 from his account, of which $8,416.46 went on personal expenses for himself, $750.00 went to a political contribution, and $16,000 went for a membership in "Catfish Point," an exclusive recreation club of which he was a general partner. He stated this would later be recouped because he had purchased three memberships, and when he sold two of them, his investment would be returned. Mrs. Retzer wrote checks during the same period from her account totaling $22,539.73, of which $16,952.23 was for herself, $2,525 went into "Fantasy," and $2,862.50 was disbursed to Mrs. Trudy Boyette, Mrs. Retzer's mother. Mr. Retzer wrote checks to her from his account totaling $9,845.28. Expenses which could be classified as expenses for them both for the six-month period totaled $134,121.76.
Following the separation in July, 1987, the corporation paid Mrs. Retzer $1,178 every four weeks, and he paid her an additional $1,150 every four weeks, totaling $2,522 per month. Also, following the separation, Mr. Retzer paid $11,000 per month for her household expenses and $850 per month on the April 1, 1987, note at the bank, altogether totaling $14,372 per month.
At a pendente lite hearing before the chancellor in February, 1988, Mrs. Retzer requested he pay her another $3,000 monthly in order "to pay her additional debts and maintain her standard of living." The chancellor allowed her an additional $1,000 per month on her other bills, and directed her to refrain from incurring any additional indebtedness until "this matter is resolved." He also allowed her accountant's fee of $4,940 and attorney's fee of $7,585.
Although directed by the chancellor at the February hearing to refrain from incurring any additional debts, Mrs. Retzer later gave her maid a $529.00 ring as a present, and on April 25, 1988, because she was depressed, she purchased for herself a jewelry pin costing $3,800. (Vol. III, 138)
In the twelve months following April, 1987, Mrs. Retzer did not curtail her purchase of items of personal luxury. Exhibit 36 shows that her balances due for jewelry, liquor and clothing increased from $5,740 to $11,368. She bought $1,600 worth of intoxicating beverages from a local liquor store.
Mrs. Retzer did not deny her extravagance, and admitted she was a poor manager, giving as her only excuse that he, too, overspent. Mr. Retzer had gone on an African safari, taking his son, and a trip to Barbados with his children, each trip costing approximately $5,000. The family spent two weeks in France, renting a house for $5,500, and one of the weeks Mr. Retzer had his parents over to stay with them. He had two watches costing several thousand dollars each, and upon cross-examination when Mrs. Retzer's counsel asked him if he would take $4,000 for the one he had on, Mr. Retzer took it off and sold it to him. There had been a lavish birthday party for Mr. Retzer in New Orleans, costing thousands of dollars, but he attributed the outlandish cost to her, saying she had handled it and it got out of hand. Mr. Retzer, active in the Republican Party, had also financed an expensive dinner in Washington for state and national political leaders.
The Retzers were apparently generous to Mrs. Retzer's mother, Mrs. Boyette, the Retzers paying for her cosmetic surgery costing several thousands of dollars. Also, they rented a house to Mrs. Boyette for $375 a month, a modest rental for the investment. Mr. Retzer testified at trial that she could live there as long as she chose. In August, 1988, in a note to Mr. Retzer, requesting a loan of over $5,000 for the house she had bought on Kirk Circle in Greenville, Mrs. Retzer also asked that he reimburse her $301.50 she had paid on Mrs. Boyette's medical bill.
*588 During the summer of 1988, following the divorce hearing, Mrs. Retzer went to Houston, Texas, for removal of a mole and cosmetic surgery of some kind. She testified her local dermatologist had found the mole and told her he could remove it. She chose instead to go to Houston, Texas, for its removal and for the cosmetic surgery. At the August, 1988, hearing she could not recall what the surgery was for or the amount she had paid.
While being examined by the chancellor, she could not tell him whether Mr. Retzer had given her $4,000 or $8,000 the previous month, saying when the court asked her questions, "it frightens me and he's frightened me." (Vol. VIII, 1091)
Mrs. Retzer testified that until their separation, Mr. Retzer had never complained seriously about her spending, that he had teased her about it.

CUSTODY
Insofar as this record reveals, both Mr. and Mrs. Retzer tried to devote time and interest to their children.
Following the birth of their second child, because of the hazard to Mrs. Retzer's health created by pregnancy, he had a vasectomy.
Mrs. Retzer attempted suicide upon one occasion at their home in Greenville by swallowing a number of pills. Mr. Retzer took her to the local hospital where her stomach was pumped out. Also, according to Mr. Retzer, in March or April, 1987, he had gotten a telephone call that Mrs. Retzer while returning from Jackson had run off the highway into a field. In later relating what happened, she told him that she had been drinking. She also told him that she had contemplated suicide and drove in front of a truck, but at the last minute lost her nerve and drove into the field. Mrs. Retzer also consulted with a psychiatrist in Jackson, but the purpose is not in the record.
Instances of pre-separation extra-marital conduct have been set forth.
After their separation, in January, 1988, Mr. Retzer left a restaurant in Greenwood late one night with a woman named "Linda." They drove to a local tennis club which was closed and parked for approximately two hours. Mrs. Retzer's private investigator followed, saw them parked, and saw when they left and returned to the restaurant. He reported this to Mrs. Retzer. Mr. Retzer testified he could only recall the young woman's name as "Linda," that he had been working that day at his places of business and went to the restaurant that evening. He had met or seen the young woman there once before. He said they left the restaurant and drove to the club, where they parked and talked. He produced a picture of the interior of the car they occupied, showing bucket front seats with a console in the middle. He said that he recognized he was being followed by the other car, and told "Linda" that Mrs. Retzer's private investigator was no doubt in the other car.
Although there were suggestions and attempts to prove some kind of relationship between Mr. Retzer and two local women, there was no proof of any marital misconduct beyond the incident with "Linda."
Following the separation, Mrs. Retzer had two more engagements with the local boy friend. Also, she made a trip to New York at the expense of a well-to-do local businessman and spent the night in a suite occupied by him. She and the businessman denied any improper conduct. They both testified he was attempting to advise and assist her in business matters.
In February, 1988, Mrs. Retzer began taking birth control pills. She stated her reason for doing so was that it took some time for them to be effective, and she took them in anticipation of her divorce.
Mrs. Retzer testified that Mr. Retzer was an excellent husband, and had been a good father. She also testified that he was the only man she had ever loved, and that she wanted to resume the marriage.
Mr. Retzer kept diaries of his trips with his children. He was a coach on his daughter's basketball team, and at the time of the divorce said that his business permitted him to spend a great deal of time with his children.

*589 DIVORCE PROCEEDINGS
As noted, Mr. Retzer filed for divorce in September, 1987. There was extensive discovery by each side. Mrs. Retzer's certified public accountant William Baird had unlimited access to Mr. Retzer's and corporate records. In addition Mr. Retzer was required to list every purchase he had made exceeding $2,500 from 1981.
A pendente lite hearing was held in February, 1988, as noted, in which Mrs. Retzer sought additional temporary alimony to pay on her debts, and Mr. Retzer was required to add $1,000 per month to the $14,371.00 he was already paying a month. Also, attorney's fees and accountant's fee were awarded her.
The trial took place June 13-17, 1988. The chancellor rendered an opinion July 8 awarding Mr. Retzer a divorce on the ground of adultery. He found that there had been no collusion, connivance or provocation on the part of Mr. Retzer as to her adultery.
Custody of the children was awarded Mrs. Retzer. The court found that "the example set by both parents as to sexual conduct will greatly jeopardize the children," as knowledge would be widespread in the community. As to her over-spending, the court found Mr. Retzer was an extravagant spender himself, with his expensive parties, safaris, and a quarter of a million dollars spent in remodeling their home. The court went on to find that Mr. Retzer was a good parent, and should be allowed extensive visitation rights.
The court found that Mrs. Retzer was not entitled to any more corporate shares, that just as Mr. Retzer had voluntarily let her have the original shares in 1973, she had voluntarily permitted him to acquire the additional ten shares in 1981.
The court found that Mrs. Retzer was entitled to an equitable division of the property beyond her corporate shares.
... It makes no difference whether she got the stock by gift from her husband as he testified, or by investment of her own funds, for from that point on she was the owner of one-half the corporation. It was that corporation that provided the funds for later acquisition of other assets. It was also that corporation that made it possible for Mr. Retzer to develop Retco and his management company.
The Court recognizes the earnings of the corporation were distributed to the owners in the form of salary and bonuses rather than dividends and that this was a substantial tax advantage to them. The Court also recognizes that Retco and the management company were developed as tax saving devices and means for withdrawing corporate profits without the payment of corporate income tax. There is no doubt that had Mrs. Retzer's half interest in the corporation been owned by a totally unrelated party rather than a family member, this type arrangement for distribution of funds would not have been permitted. There is also no doubt that Mrs. Retzer received substantial benefit from the funds that were distributed to Mr. Retzer by way of salary, bonus, and payments to one of his other businesses, for these were the sources of funds that provided her expensive clothes, car, house, trips, and so on.
This Court also recognizes that Mrs. Retzer might have contributed slightly to the accumulation of assets through her labor such as suggestions for decorations, but is of the opinion that her contribution through labor is very insignificant when compared to Mr. Retzer's, while her contribution through capital is significant when compared to his. This Court also is of the opinion that Mrs. Retzer has already received a significant distribution of the earnings from her capital in that this has supported some of her extravagant spending. With these facts, though, the Court concludes that she is entitled to some equitable divisions of the assets accumulated during the marriage, though she is clearly not entitled to half for her contributions have not been equal to his.[3] (Emphasis added)
*590 The chancellor went on to find, however, that even with all the discovery and accountants' services, he was unable to determine their assets. He therefore continued the matter for a later hearing to ascertain their assets.
Another hearing was conducted August 19, following which the chancellor rendered an opinion September 7, 1988. He concluded that their combined net worth was $4,100,000, with Mr. Retzer holding about $3,000,000 of the assets. He found that she owned 27% of the total assets and was entitled to another eight percent giving her a total of 35% of the assets. He directed Mr. Retzer to pay her $275,000 over a two-year period, with interest at the rate of eight percent per annum.
He awarded Mrs. Retzer $2,500 per month in child support. He then awarded her $88,000 per year alimony ($7,333.33 per month), with the provision that any sum paid by the corporation to her in dividends would be deducted from the alimony due her. He said that a fair return on her corporate investment should yield her eight percent per year.
He also directed that Mr. Retzer provide her with hospital insurance equivalent to that she had in the past, which could be paid by him directly or through the corporation. There was a division of two residences, with Mrs. Retzer being required to relinquish her interest in one, and he the other, and each thereafter to assume all indebtednesses on them.
There were other provisions in this involved matter unnecessary to include in this opinion.

LAW
In view of the chancellor's finding that Mr. Retzer was entitled to a divorce on the ground of adultery, and Mrs. Retzer having made no cross-appeal, it is immaterial what she alleged or proved as to his marital misconduct between their reconciliation in 1979 and their separation in July, 1987. The chancellor rejected her evidence, but in fairness we have nevertheless sought to set forth the facts concerning them both from the record.
With the exception of the 1982 incident with the female employee in Greenwood, and Mrs. Retzer's allegation that she observed his penis bruised at one time, both of which Mr. Retzer denied, there is no proof in this record of any extra-marital misconduct on his part from July, 1979, through July, 1987, when they separated. There is no proof whatever of any adultery on his part.
Mrs. Retzer's adultery on the other hand was not some isolated incident, but rather a continuing, persistent affair with a local man. She was caught in 1981 and forgiven, after promising it would end. It resumed and continued over a three- or four-year period.

A. LUMP SUM ALIMONY
While lump sum alimony is in a sense an award to a wife of a portion of her husband's estate, this Court has consistently made the distinction between divesting a husband of his property and vesting it in the wife, and lump sum alimony. We have always held that in the absence of a resulting or constructive trust the wife's services as a housewife or a farm wife without more did not authorize a court in a divorce action to give her an equitable interest in his property. The authority of courts in a divorce to transfer property of either spouse to the other is purely statutory, and in the absence of statutory authority a court has no power to deal with vested property rights. Rosamond v. Rosamond, 250 Miss. 742, 748, 168 So.2d 294, 296 (1964). See also, Hinton v. Hinton, 254 Miss. 50, 179 So.2d 846 (1965); Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147 (1955); Windham v. Windham, 218 Miss. 547, 67 So.2d 467 (1953); McCraney v. McCraney, 208 Miss. 105, 43 So.2d 872 (1950); Grego v. Grego, 78 Miss. 443, 28 So. 817 (1900).
*591 On the other hand, we have long since recognized the discretionary authority of the chancery court to award lump sum alimony.
"... It [lump sum] is a settlement between the husband and the wife as to the interest of the latter in his property, and as to the extent of the husband's duty to contribute to her maintenance and support."
The solution of the question of whether or not an allowance of a gross sum should be made must be determined by the facts of the particular case, having due regard to the best interest of the parties and the husband's financial ability to respond to an award in gross. Where the husband's estate is sufficient to enable him to respond to an award in gross, it will often be conducive to the welfare and happiness of both parties to end the relation of debtor and creditor between them by making such an award, and thereby relieve the wife of further dependence upon the continued solvency of the husband and his financial ability to pay a periodical stipend and his continued response to such forced contributions without future legal steps to enforce them.
Miller v. Miller, 173 Miss. 44, 64, 159 So. 112, 119-120 (1935).
Until Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973), none of our cases suggested, however, that a wife who had been a dutiful and frugal housewife without more was for that reason entitled as a matter of law to a lump sum alimony as opposed to or in addition to periodic alimony. Instead, it was discretionary with the chancery court. Aldridge v. Aldridge, 200 Miss. 874, 877, 27 So.2d 884, 885 (1946). See also, Harrell v. Harrell, 231 So.2d 793 (Miss. 1970); McCraney v. McCraney, supra; Hopkins v. Hopkins, 174 Miss. 643, 165 So. 414 (1936). Then in Jenkins, supra, we departed from the rule of leaving the award of lump sum (as opposed to or in addition to periodic alimony) purely discretionary, holding that "where the wife has contributed to the accumulation of the property of her husband, doing her part as a housewife, it would not be improper that she be allowed a reasonable amount of lump sum alimony." 278 So.2d at 449. Thereafter in Clark v. Clark, 293 So.2d 447, 449 (Miss. 1974), in which the wife had contributed to her husband's wealth by working in his business as well as a housewife, we held:
Under these circumstances, the wife, helpmate and co-worker who is forced out of the marriage partnership through no fault of her own is entitled to a fair, equitable and just allowance. This can be accomplished, in the discretion of the chancellor after a hearing to fully develop the facts in this regard, by either a lump sum award, plus monthly alimony payments or monthly alimony payments of such a substantial nature that it reflects not only the husband's duty to care for his former wife in the manner in which she has grown accustomed but also her share in the jointly accumulated assets so that she might, from this extra sum, provide for her future security. Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973). (Emphasis added)
One or both of two common threads thereafter appear in all of our awards of lump sum alimony. First, the wife had through her efforts been a material economic benefit in the creation of her husband's wealth, such as quitting her job to help him in his business or profession, helping him through college, working in his business or profession, and frequently offering him valuable counseling in his business or investments. In these cases it could fairly be stated that but for her actual assistance to him in his business or profession he would not have accumulated such wealth, an excellent example being Jones v. Jones, 532 So.2d 574 (Miss. 1988). The second factor, as first stated in Jenkins, supra, was in being a dutiful, faithful housewife.
In Clark and thereafter in Reeves v. Reeves, 410 So.2d 1300 (Miss. 1982), we noted that these holdings did not "make Mississippi a community property state, but further delineate the serious responsibility of a chancellor to make intelligent and fair provision for the wife." Reeves, 410 So.2d at 1302; Clark, 293 So.2d at 449-450. Following *592 these cases this Court considered lump sum awards alone or in conjunction with periodic alimony in Jones, supra; Skinner v. Skinner, 509 So.2d 867 (Miss. 1987); Tutor v. Tutor, 494 So.2d 362 (Miss. 1986); Abshire v. Abshire, 459 So.2d 802 (Miss. 1984); Schilling v. Schilling, 452 So.2d 834 (Miss. 1984). Then, in Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988), where the wife was granted a divorce from her husband on adultery, from our previous cases we congealed factors considered in awarding lump sum alimony where the wife was granted a divorce:
1) Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business. Tutor v. Tutor, 494 So.2d 362 (Miss. 1986); Schilling v. Schilling, 452 So.2d 834 (Miss. 1984);
2) A long marriage. Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973); Tutor and Schilling, supra;

3.) Where recipient spouse has no separate income or the separate estate is meager by comparison. Jenkins, Tutor and Schilling, supra;

4. Without the lump sum award the receiving spouse would lack any financial security. Abshire v. Abshire, 459 So.2d 802, 804 (Miss. 1984).
A closer analysis of these cases, however, reveal that the single most important factor undoubtedly is the disparity of the separate estates.
537 So.2d at 438. White v. White, 557 So.2d 480, 483 (Miss. 1989).
Every lump sum alimony award addressed in this Court had one thing in common: the wife was granted the divorce from the husband because of his wrong-doing.
Going to the instant case, Mrs. Retzer must fail in the first instance because she was not granted a divorce. It was Mr. Retzer who was granted the divorce because of her wrong doing. Yet even if she had been granted a divorce, she still would not have satisfied the Cheatham test. Mrs. Retzer owns 49.8% of the shares in Retzer and Retzer, the corporate owner of five commercially successful McDonald's restaurants, which should afford her a substantial income.
As to the first factor, she made no substantial contribution to the accumulation of the total wealth of Mr. Retzer and her. At most, all or a portion of her teacher's salary of from $10,000-$14,000 went into the original 1971 investment, which Mr. Retzer hotly disputed. Giving her credit for this, an almost equal ownership in the corporation was an eminently fair return. Nor can she claim the role of the dutiful, frugal housewife.
Mrs. Retzer did meet the second factor  it was a long marriage.
Mrs. Retzer did not meet the third and fourth factors because she will have a separate income or estate and financial security without any lump sum award.
The disparity in their ownership of the restaurants comes from Mr. Retzer as an individual starting two new McDonald's, one in Yazoo City in 1983, and the other in Greenville in 1985. He has no lump sum alimony obligation from these acquisitions during a period when she was committing adultery and living a profligate life-style. She contributed no property, income or services in the acquisition of these restaurants. To hold that she somehow had an equitable claim in the value of these restaurants would mean no principled guide whatever in awarding lump sum alimony, depending instead on the particular view of whatever chancellor heard the case. Indeed, it would make a mockery of our effort in these cases to deal fairly with both parties to a divorce.

B. PERIODIC ALIMONY
It is a general rule that alimony will not be allowed a wife when the husband is granted a divorce because of her fault. Beacham v. Beacham, 383 So.2d 146, 147 (Miss. 1980); Russell v. Russell, 241 So.2d 366, 367 (Miss. 1970).
The rule is a sound one and is based on the proposition that a husband is entitled to have his wife receive her support in his home while she is discharging the *593 duties of a wife as imposed under the marriage contract.
Bunkley & Morse's Amis on Divorce and Separation in Mississippi, § 6.04, p. 184 (1957).
An exception to this rule has been made in cases where the marriage has been of long duration, the husband is able to pay alimony in some amount, and the wife has no means of livelihood. See, Wires v. Wires, 297 So.2d 900, 903 (Miss. 1974) (on habitual cruel and inhuman treatment); Rainey v. Rainey, 205 So.2d 514, 515 (Miss. 1967) (on habitual cruel and inhuman treatment); Gatlin v. Gatlin, 248 Miss. 868, 871, 161 So.2d 782, 783 (1964) (on habitual cruel and inhuman treatment); Shows v. Shows, 241 Miss. 716, 720, 133 So.2d 294, 296 (1961) (on habitual cruel and inhuman treatment); Hibner v. Hibner, 217 Miss. 611, 617, 64 So.2d 756, 758 (1953) (on habitual cruel and inhuman treatment); Carraway v. Carraway, 212 Miss. 857, 858, 56 So.2d 41, 42 (1952) (on desertion); Winkler v. Winkler, 104 Miss. 1, 61 So. 1 (1913) (on desertion). In each of these cases the ability of the husband to pay alimony was coupled with an inability of the wife to make a living or support herself.
Where divorce has been granted to the husband on the ground of the wife's adultery, however, this Court has consistently denied any alimony, period. Hodum v. Crumpton, 329 So.2d 667, 668 (Miss. 1976); King v. King, 191 So.2d 409, 411 (Miss. 1966); Keyes v. Keyes, 252 Miss. 138, 144, 171 So.2d 489, 490 (1965). See, Winfield v. Winfield, 203 Miss. 391, 402, 35 So.2d 443, 447 (1948); Hulett v. Hulett, 152 Miss. 476, 119 So. 581 (1928).[4]
Two of our decisions might suggest otherwise, Jordan v. Jordan, 510 So.2d 131 (Miss. 1987), and Wood v. Wood, 495 So.2d 503, 506 (Miss. 1986). In both these cases the husband had been granted a divorce from the wife on adultery, and in both cases the wife was awarded alimony, but in meager sums. In both, the wife appealed, challenging the granting of a divorce to the husband and the inadequacy of alimony, but no cross-appeal was perfected by the husband in either case. As a consequence we were not called upon to address the specific question of whether or not the wife was entitled to any alimony.
While our cases in which we have awarded the wife alimony when her husband was granted the divorce do not specifically make a distinction between the amount such a wife is entitled to as compared with a wife granted a divorce when her husband was at fault, the facts and our holding indicate the purpose of the award was not to afford the wrongdoer wife alimony in accordance with her standard of living, but rather alimony sufficient to prevent her from being in desperate need. In Carraway, 212 Miss. at 858, 56 So.2d at 42, the wife was sick, unable to make a living and was having to live with her parents, and her was husband partially at fault. In Gatlin, 248 Miss. at 870, 161 So.2d at 783, the wife was awarded $200 monthly alimony for eighteen months, which she contended was too small. We affirmed, directing the chancery court to retain jurisdiction to determine her condition at the conclusion of eighteen months. Id., 248 Miss. at 781, 161 So.2d 782.
Although appellant was the guilty party, the record reflects that she is poor and weak, and almost continually ill with chronic bronchitis, asthma, and alcoholism. We do not say that the chancellor should allow alimony after the eighteen months, but he should retain jurisdiction on that issue. Reconsideration of this question may or may not be appropriate, within the sound discretion of the chancery court, and in accordance with circumstances which might be developed at a later hearing.
Id.
In Wires, we held the chancery court "was in error in not providing adequate alimony under the close facts here shown, *594 particularly where the wife is ill and willing to resume her marital duties." Wires, 297 So.2d at 902. We reversed "so that the court may reconsider the evidence and award additional adequate alimony until the appellant can reasonably earn her livelihood." Id.
Finally, in Wood, 495 So.2d at 506, the appellant wife made the argument that our cases failed to make any distinction between the wrong-doer wife and the wronged wife in alimony awards. We acknowledged as much. However, we did not increase the chancery court's alimony award to Mrs. Wood of $10,000 payable in $500 monthly installments without interest, which we would have been compelled to hold was shockingly inadequate had she been granted a divorce from her husband. This was a 36-year marriage with four children, and Mrs. Wood had no skills, and had only been employed as a babysitter and private nurse's assistant at $3.50 per hour. Id. She had recently had cancer surgery. Id. Mr. Wood, on the other hand, had an annual income of $40,000 of which $8,400 was non-taxable. Id. Had Mrs. Wood been granted a divorce from her husband in this case, the alimony award manifestly would have shocked the conscience as being pitifully inadequate.
Significantly, neither Jordan nor Wood overruled Hulett v. Hulett and its progeny. We are not called upon in this case to specifically decide whether adultery committed by the wife is an absolute bar to alimony because we find that Mrs. Retzer was not entitled to periodic alimony under Hibner v. Hibner, and its progeny, either. She is a college graduate, capable of full-time employment, and owns 49.8% of the shares in the corporate owner of five commercially successful McDonald's restaurants.
There is no justification to require Mr. Retzer to pay her periodic alimony.

OBLIGATION OF MR. RETZER TO MRS. RETZER
Mr. Retzer does have substantial financial obligations to Mrs. Retzer, however, arising from her ownership of almost half of the shares of Retzer and Retzer, Inc.
Courts look quite differently upon the respective duties existing between majority and minority shareholders in publicly held and close corporations. F. O'Neal, Oppression of Minority Shareholders, § 3.06 at 78 (1975); Comment, The Strict Good Faith Standard  Fiduciary Duties to Minority Shareholders in Close Corporations, 33 Mercer Law Review 595 (1982); Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 328 N.E.2d 505 (1975); Smith v. Atlantic Properties, Inc., 12 Mass. App. 201, 422 N.E.2d 798 (1981) (holding minority shareholders also have fiduciary duties to majority shareholders). Retzer and Retzer, Inc., is a very close close corporation, which has existed solely for the financial benefit of two people, the Retzers. This corporation has no other purpose except through legal ownership of five McDonald's restaurants to create wealth for and furnish income to Mr. Retzer and Mrs. Retzer. For almost two decades, and through Mr. Retzer's management, the corporation has indeed furnished them both with large incomes.
Now, through ownership of ten more shares than she, Mr. Retzer has control of the management of Retzer and Retzer. As such, under well settled principles he has a fiduciary obligation to Mrs. Retzer in the management of her property, and imposed with a trustee's duty to preserve, protect and produce income from her corporate shares. See, Donahue, 328 N.E.2d at 512; Matter of Kemp & Beatley, Inc., 64 N.Y.2d 63, 484 N.Y.S.2d 799, 803, 473 N.E.2d 1173, 1177 (1984); Alaska Plastics, Inc. v. Coppock, 621 P.2d 270, 276 (Alaska 1980); Illinois Rockford Corp. v. Kulp, 41 Ill.2d 215, 222, 242 N.E.2d 228, 233 (1968); Zokoych v. Spalding, 36 Ill. App.3d 654, 671, 344 N.E.2d 805, 819 (1976); F. O'Neal and R. Thompson, O'Neal's Oppression of Minority Shareholders, § 7.17 (1985); Comment, supra, p. 27, at 593; 18 C.J.S. Corporations, § 327; 18A Am.Jur.2d § 764, p. 633. In fact, it has been held that he holds the same duty as a managing partner owes the other partner in the management of partnership *595 affairs. Donahue, 328 N.E.2d at 512; Knaebel v. Heiner, 663 P.2d 551, 552 (Alaska 1983). See, Delaney v. Georgia-Pacific Corp., 278 Or. 305, 310, 564 P.2d 277, 281 (1977); Johns v. Caldwell, 601 S.W.2d 37, 41 (Tenn. App. 1980). Any relaxation of this solemn obligation will be at his peril.[5]
He must manage the corporation prudently, and after paying necessary and reasonable expenses, and setting aside whatever is reasonably necessary for corporate reserves and equipment and facilities, pay her 49.8% of the net remaining. He will not be acting at arm's length, but as trustee over her shares. He must keep her currently, fully and accurately informed and abreast of his management, and under regular periodic accounting. While their interest as husband and wife was essentially identical, now they are adverse to each other. This will make his conduct as trustee that much more subject to close scrutiny by a chancery court.
Just as it has authority to require a husband to pay his wife periodic and lump sum alimony from his property and estate, the chancery court clearly has authority to require a divorced husband to pay his wife whatever is due her in his management of her property. There was no manifest error in the chancellor's ordering Mr. Retzer to see that she received an income of $7,333.33 per month from Retzer and Retzer. This is neither a floor nor a ceiling, but from the present financial information an amount the chancellor considered reasonable. We find no occasion to reverse this amount. It will, of course, be subject to change, depending upon the economic welfare of the corporation.
With the hostility existing between them, it would no doubt be preferable if somehow the property of Mr. and Mrs. Retzer were entirely separate, with neither depending on the other. Indeed, having imposed upon him the obligation of a trustee, the greater burden in this continued economic joinder may very well fall upon Mr. Retzer. The fact remains that at present they are siamese twins in Retzer and Retzer. If the burden becomes unduly oppressive for either, the chancery court is not without power to give relief, even to appointing a receivership for the corporation or dissolving it. Miss. Code Ann. § 79-4-14.32; § 79-4-14.30(2)(ii), (iv) (Supp. 1990); Balvik v. Sylvester, 411 N.W.2d 383 (N.D. 1987); 18 Am.Jur.2d § 767.
We therefore affirm the amount of monthly income Mrs. Retzer is to receive, but amend the judgment to reflect this as an obligation of Mr. Retzer to see that she receives this sum from his management of the corporation.
The error of the chancellor, as above noted, was in decreeing that Mr. Retzer pay Mrs. Retzer $88,000 per year, or $7,333.33 per month, as alimony. The chancellor, of course, recognized the difficulty of this holding, because in the same decree he held that any sum received by Mrs. Retzer from the corporation would correspondingly reduce his alimony obligation.
Our holding should also be preferable to Mrs. Retzer as there will be no financial impediment to her remarrying.

CUSTODY
While the chancellor awarded Mr. Retzer a divorce on the ground of Mrs. Retzer's adultery, he did not take this into consideration in awarding Mrs. Retzer custody of the children. Instead, he found that "the example set by both parents as to sexual conduct will greatly jeopardize the children." The alleged advance Mr. Retzer made to an employee in 1982, if true, is hardly praiseworthy, but it is a far cry from the record proof of Mrs. Retzer's continued, sustained infidelities culminating in the July, 1987, separation. It will not be the 1982 incident the children will hear about in school or from playmates. There was no basis from this record to *596 equate the extra-marital misconduct of Mr. Retzer and Mrs. Retzer.
As to her overspending, again the chancellor equated Mr. Retzer's extravagance with hers. Here also the record does not support that Mr. Retzer, who after all was working for the income, spent anything like the money on himself that she did on herself, or that he in any way mismanaged his personal finances. Nor is there any suggestion in the record that Mr. Retzer was penurious or miserly with her, or attempted to keep her from doing anything except to wildly overspend.[6] Retzer and Retzer owns five McDonald's restaurants with yearly profits of several hundred thousand dollars, and worth a fortune. If that is extravagant management, many investors would welcome the opportunity to have a stake in it.
Mrs. Retzer's lifestyle and emotional depression raise serious questions of the stability and example a parent should impart to his or her children. The record shows Mrs. Retzer  as she herself stated  "spoiled" and self-centered, intent on narcissistic personal pleasures and vanity. Having spent over $50,000 in 1986 on purely personal luxuries, Mrs. Retzer nevertheless in March, 1987, found herself over $40,000 in debt for unpaid bills for purely personal luxuries, and the debts for her personal luxuries in 1987 continued to mount. Mrs. Retzer's uncontrolled spending and intent on personal pleasure, and Mr. Retzer's testimony that even he could not control it, is borne out from the two examples.
At the February, 1988, temporary hearing when Mrs. Retzer was receiving $14,372 for monthly expenses, she requested an additional $3,000 per month to permit her to live in her lifestyle. The chancellor awarded her an additional $1,000 per month. He also ordered and directed her not to increase her indebtedness prior to trial. Despite this she spent $530 for a piece of jewelry for her maid, and another $3,800 for a pin for an anniversary present for herself. She was feeling "very depressed." A court order did not restrain her.
Following the June, 1988, trial, and pending a hearing in August to set the amount of alimony to be awarded her, Mrs. Retzer's local dermatologist found a mole on her face. He assured her that he could remove it. Yet she went to Houston, Texas, to have the mole removed and for cosmetic surgery. At the August, 1988, hearing she would not tell, and the court did not require her to disclose the nature of the surgery, and she testified she could not even remember the cost of the medical bill.
However troubling the record, the decision of this Court comes over two and one-half years after the award of custody to Mrs. Retzer. The daughter is now a teenager. It would take the wisdom of Solomon to know at this time what is truly in the best interest of these children, and we do not feel constrained to reverse the chancellor on his custody award.
The child support, while liberal, will of necessity come from the most part from the business Mr. and Mrs. Retzer own in almost equal shares, and we see no reason to reverse this award. If it is not spent with some degree of prudence, a chancery court can afford relief.
We therefore affirm the custody and child support award.
The decree of the chancery court is accordingly reversed and rendered on the $275,000 lump sum award to Mrs. Retzer, and affirmed on the award of custody of the children. The $88,000 annual award to her is affirmed, but modified as a fiduciary obligation of Mr. Retzer to Mrs. Retzer to see that she gets that return from her ownership of 1,600 corporate shares in Retzer and Retzer.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PITTMAN, J., concur.
*597 PRATHER, ANDERSON and BLASS, JJ., dissent.
ROBERTSON and SULLIVAN, JJ., not participating.
PRATHER, Justice, dissenting:
[T]he point which drew all eyes, and, as it were, transfigured the wearer,  so that both men and women, who had been familiarly acquainted with Hester Prynne, were now impressed as if they beheld her for the first time,  was that SCARLET LETTER, so fantastically embroidered and illuminated upon her bosom. It had the effect of a spell, taking her out of the ordinary relations with humanity, and enclosing her in a sphere by herself.
Nathaniel Hawthorne, The Scarlet Letter

Our society has always sought to foster "the establishment and continuance of the family unit and the mutual obligations and rights of its members." V. GRIFFITH, OUTLINES OF THE LAW 23 (1949). These rights and obligations, both at initiation of the marriage and its dissolution, are insured by the State and courts acting as "third party" to the marital contract. And society's attitudes regarding these mutual rights and obligations have undergone change over the past decades in response to a "more enlightened cultural sentiment." Id.
One such change  the recognition that marital fault should no longer be a sanction in custody awards  is clearly an enlightened view. See e.g., Carr v. Carr, 480 So.2d 1120, 1121 (Miss. 1985) ("This Court holds that the fact of adultry [sic] alone does not disqualify a parent from custodianship, but that the pollster [sic] consideration in original custody determinations is the best interest and welfare of the minor child.").
The majority opinion in the case sub judice reflects regression from society's (and this Court's) evolving, enlightened view. Both Michael and Nancy admitted to committing adultery. However, the majority uses infidelity against Nancy as a sanction in equitable property division  while ignoring Michael's own infidelity.
The chancellor's decision is equitable and should be affirmed.
The following was initially prepared as the majority opinion. Since it has failed to maintain the approval of a majority of Justices, it is now submitted in its entirety as a dissent.

I. INTRODUCTION
Mike and Nancy Retzer were married in Louisiana on December 19, 1970. Mike was a 24-year-old officer in the U.S. Air Force and Nancy a 21-year-old education major at Louisiana State University. In 1972, after Mike completed his tour with the Air Force and Nancy graduated, the Retzers moved to Greenville, Mississippi, where they opened their own McDonald's fast-food restaurant. Mike operated the restaurant, and Nancy taught in the public school system while helping Mike on a part-time basis. The Retzers' restaurant business was so successful that they opened six more McDonald's in other towns during the 13 years that followed. The restaurants were incorporated as Retzer & Retzer ("R & R"), and all equipment used in the restaurants was leased from Retco, another corporation of the Retzers'. (Retco was set up for tax-saving purposes.)
But all was not well with the Retzers; the success with their business did not spill over into their marriage. Mike and Nancy eventually discovered that the other had indulged in extra-marital affairs. Nancy filed for divorce but, hoping to save her marriage, she eventually withdrew her petition. Unfortunately, the marital condition worsened and, in 1987, Mike filed for divorce on grounds of adultery and irreconcilable differences. After lengthy discovery and hearings at the Washington County Chancery Court, the divorce was granted. Through the divorce decree, Nancy was awarded custody of the Retzers' two children; she was also awarded both lump-sum and periodic alimony. Feeling aggrieved by the decree, Mike appealed, and Nancy cross-appealed on inadequacy of property division. Nancy subsequently moved for withdrawal of her cross-appeal, and she now seeks affirmance of the chancellor's *598 award. The issues presented are addressed in the following analysis.

II. ANALYSIS

A. ISSUE: Whether the Chancellor Erroneously Awarded Nancy Custody of Their Two Children

1. The Chancellor's Decree and Parties' Contentions
Nancy retained custody of the two children, Kathryn (14 years old) and Michael Jr. (8 years old), after Mike left her in July, 1987. About a year later, the chancellor awarded Nancy permanent custody of the children. The chancellor's opinion, upon which he based his decision, is a lengthy one:
Having determined that the plaintiff is entitled to a divorce the Court must now address the issue of custody of the two minor children of the parties. With the exception of testimony indicating immoral conduct in the form of extra-marital sexual activity on the part of both parents, most evidence indicated that both parents are suitable and dedicated parents.... Mr. Retzer testified that Mrs. Retzer abused alcohol and that she was a pathological liar. There was also evidence that in connection with the hostility of the divorce she made some attempt at suicide which raises some question about her emotional stability. In addition, the evidence seems clear that she is a very poor financial manager for she regularly spends without regard to her ability to repay and her husband is forced to come to her aid and satisfy the obligation she has made that she can not meet.
As to the allegations of alcohol abuse, no one testified to this other than Mr. Retzer and until the child custody dispute arose over the divorce, apparently it was no problem. There is also no evidence of pathological lying except from the husband and there is no evidence of this being a problem until the child custody heated up.
The facts further reveal that during recent years the mother has primarily been a housewife with the principal responsibility for rearing the children. She has, however, had a full time maid and apparently the maid has provided a large part of the care of the children. The evidence also reveals she has some plans to resume her career after the divorce is resolved.
The father has apparently played a bigger role than the average father in rearing the children for he has often transported them to and from school and carried them to the doctor. He, however, has been the principal breadwinner with the responsibility for operating a very substantial business. His business is at the point that he has sufficient managerial help to permit him substantial flexibility in his schedule. In addition, the father has been very active in politics and he obviously spends a good amount of time away from his home in political activities. On some of these political travels the mother has accompanied him.
Under these facts the Court must determine to whom custody should be awarded. The father argues that because of the mother's adultry [sic] she is not entitled to custody and there are cases in Mississippi so holding. Winfield v. Winfield, 35 So.2d 443; Keyes v. Keyes, 171 So.2d 489. However, more recent cases have modified this rule and hold that such conduct is only one factor to be considered. In Yates v. Yates, 284 So.2d 46 ([Miss.] 1973), the Court said: "The rule announced in Keyes is a general rule that a parent guilty of adultry [sic] should not be awarded child custody, but there are exceptions to this rule." In 1985, in Carr v. Carr, 480 So.2d 1120, the Court said: "This Court holds that the fact of adultry [sic] alone does not disqualify a parent from custodianship, but that the pollstar [sic] consideration in original custody determinations is the best interest and welfare of the minor child." It further went on to say that the guidelines set forth in Albright v. Albright, 437 So.2d 103 [1003 (Miss. 1983)] should be followed in custody determinations. In Albright the *599 Court provided guidelines for determining custody by stating as follows:
"We affirm the rule that the pollstar [sic] consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and it is but one factor to be considered. Age should carry no greater weight than other factors to be considered such as: Health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parent; emotional ties of parent and child; moral fitness of parents; the home school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Marital fault should not be used as a sanction in custody awards. Relative financial situation is not controlling since the duty to support is independent of the right to custody. Differences in religion, personal values, and lifestyle should not be the sole basis for custody decisions."
This Court has sought to apply these criteria to the facts here and as to some of the factors such as emotional ties to the child or preference to the children, it has no evidence. On the other factors such as willingness and capacity it finds little difference between the two. It also finds limited difference between them as to moral fitness since both have admitted adultry [sic] and both are apparently accustomed to stretching the tax laws such as their buying all appliances for their home through Retzer and Retzer. There are, however, some of the factors wherein the Court can make a distinction. The Court is of the opinion that in normal circumstances a 12 year old girl and a 5 year old boy would be better off with their mother. The mother has also been the principal custodian up to this point in their lives and leaving them with her would provide continuity of care. At this point the mother has no employment and would be available to care for them. The Court recognizes that she has made some statement about employment, but she has taken no action along these lines at this point. On the other hand the father has the responsibility for substantial business activity and still has his involvement with politics. He testified that he has a flexible schedule and can arrange it so he can care for the children, but he still has all the business responsibilities and the Court concludes that this factor favors the mother. The lack of responsibility in managing her financial affairs and her attempt at suicide clearly cause the father to be favored insofar as emotional or mental strength of the parties is concerned. In addition to these factors the father argues that the mother will be a bad role model for the children because of her adultry [sic] and her financial irresponsibility. This Court is of the opinion that with the testimony and admissions that have occurred in this Court and with the likelihood of widespread publication of this in the community in light of their community standing, that the example set by both parents as to sexual conduct will greatly jeopardize the children without regard to who has custody for all will know who their parents are and all will likely know of the conduct of their parents and this will put pressure on the children. As to her fiscal irresponsibility, this Court can not put all the blame for this on her for the evidence is that he, too, has been an extravagant spender with the big difference being he controlled the purse strings and could limit the availability of her funds. For example, he complained of her spending for clothes and jewelry, but does not complain of the expensive parties he wanted, his salaries, or one-quarter million dollars spent in remodeling their home. Having considered these factors the Court concludes that it is in the best interest of the *600 children that custody be awarded to the mother.
Vol. II, at 197-201 (emphasis added).
Mike rejects the chancellor's opinion and reiterates, for the most part, that Nancy is "unfit" to have custody due to her acts of infidelity and, under the "general rule in Mississippi," a "parent who is guilty of infidelity is not entitled to the custody of the children." See Appellant's Brief at 27 (quoting Carr v. Carr, 480 So.2d 1120, 1121 (Miss. 1985)).
Nancy counters that Mike admitted committing adulterous acts with several women, including a next-door neighbor, in the Retzers' marital home. Nancy adds that "Mike really did not want custody of the children" and that he simply "wanted to use [them] as a pawn to negotiate with Nancy" the monetary aspects of the divorce.

2. Relevant Law and Recommended Disposition
As evinced in the preceding subsection, the chancellor extensively analyzed the evidence and applicable law. He began by noting that, "with the exception of testimony indicating immoral conduct ... on the part of both parents, most evidence indicated that both ... are suitable and dedicated parents." He then weighed other relevant factors  specifically those enunciated in Albright v. Albright  and found that "it is in the best interest of the children that custody be awarded to the mother." See also Carr v. Carr, 480 So.2d 1120, 1123 (Miss. 1985) ("From this Court's view of the entire opinion, it concludes that the chancellor applied the rule of best interest and welfare of the children to his custody determination.") (citing Albright, supra.) The record supports the chancellor's fact-finding  with which the parties virtually did not dispute during oral arguments before this Court. This Court is "bound by those findings unless it can be said with a reasonable certainty that those findings were manifestly wrong and against the overwhelming weight of the evidence." Id. at 1123-24 (citing Torrence v. Moore, 455 So.2d 778 (Miss. 1984)); but see Appellant's Brief at 28-29 (where Mike seems to suggest, erroneously, that this Court's standard of review is: "whether there has been a material change of circumstances") (citing and quoting Smith v. Todd, 464 So.2d 1155, 1157 (Miss. 1985), and McRae v. McRae, 381 So.2d 1052, 1056 (Miss. 1980)).
In sum, perusal of the record, briefs, and chancellor's opinion leads this Court to hold that no manifest error is evident. The chancellor's determination concerning custody of the children, who have been living with their mother now for over three years, is affirmed.

B. ISSUE: Whether the Chancellor Erred in Ordering Mike to Provide Child Support in the Amount of $1,250 Per Month, Per Child in Addition to Medical Insurance and Tuition

1. The Chancellor's Decree and Parties' Contentions
The chancellor opined that "[a]s to child support, it is clear that these parties and their children have been accustomed to a very high standard of living and that with his income the father clearly has a duty to aid in their support." In determining the amount of support which Mike must provide, the chancellor held a separate hearing to ascertain the Retzers' net worth. The chancellor then concluded that the Retzers' net worth was approximately $4.1 million  $3 million of which was in Mike's name. The chancellor's conclusion seems conservative. A "Balance Sheet" prepared by Mike unequivocally shows that his and Nancy's combined net worth is at least $5.5 million.[1]
Like his net worth, Mike's yearly income  compared to Nancy's  is also substantial. For example, the following figures reflect the salaries each received from R & R during 1984 to 1987:

 Mike Nancy
 1984 $260,540.00 $21,590.00
 1985 $279,077.00 $21,591.00
 1986 $224,539.00 $21,610.00
 1987 $233,769.24 $33,611.20
 ___________ __________
 Total: $997,925.24 $98,402.20

*601 Vol. I, at 46; Vol. II, at 163. The Retzers also receive income from other sources (e.g., from Retco); their joint federal and state income tax returns reveal that they received a gross income of $455,595 in 1986. This means that they received nearly $200,000 above and beyond that received from R & R.
Based upon the Retzers' substantial income and the finding that "it is clear that these parties and their children have been accustomed to a very high standard of living," the chancellor "ordered and directed" Mike "to pay Nancy ... the sum of ... $1,250.00 ... per month per child ... and to provide or maintain ... medical insurance" as well as the costs of the children's "private school tuition for the school they now attend."[2] The amount of the award was also based upon a compilation by Nancy of the children's "estimated monthly [living] expenses"  an estimation to which Mike did not object nor dispute. See, e.g., Ex. 11 ("Estimated Monthly Expenses"); Vol. I, at 61-62 (The chancellor noted: "Exhibit 11 to the written stipulations filed with this Court list[s] the living expenses of Mrs. Retzer ... and Mr. Retzer makes no objection to being required to continue paying the ... expenses that Exhibit 11 indicates he is paying.") (emphasis added).
Mike contends the chancellor's determination is "too high" and constitutes an abuse of discretion. He rationalizes, for the most part, that the amount "compare[s] favorably with [various] public officials[']" 1987 salaries (e.g., "Clerk of the Supreme Court earns $31,000, which is less than the amount which he must pay to support his two children each year). Mike adds that, "[n]o matter how rich the parents, there are reasonable limits to what young children can use and consume."
Nancy counters with several contentions. For example, she contends that the amount which Mike has been ordered to pay is substantially less than that which he paid prior to their separation. And "Mike, himself, told the Court that any money spent on the children was not wasted." Appellee's Brief at 25. Nancy also cites relevant Mississippi statutory law which dictates "any award for child support entered judicially or administratively must allocate 25% of the non-custodial parent's adjusted gross income for the support of two children unless the trial Court makes a written finding that the application of the guidelines would be unjust or inappropriate." Id. at 26 (citing MISS. CODE ANN. § 43-19-101 (1989 Supp.)). The chancellor's award does not constitute 25% of Mike's gross income. Were the chancellor to have strictly complied with the statutory guideline, Mike would have been ordered to pay substantially more.

2. Relevant Law and Recommended Disposition

a.
In Tedford v. Dempsey, this Court delineated a general guideline which a chancellor should consider before entering a child support decree:
[T]he chancellor should consider all circumstances relevant to the needs of the children and the capacities of the parents. The reasonable needs of the children is obviously the beginning point in such inquiry. There is always some minimum level of food, clothing, shelter, day care, education medical care and the like that must be provided. Above that, what is reasonable turns on the circumstances  and one of the major circumstances is the financial resources reasonably available to each parent.
437 So.2d 410, 422 (Miss. 1983); see also Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147 (1955), and its progeny. Recently-enacted statutory law provides a more specific guideline. See MISS. CODE ANN. § 43-19-101 (1990 Supp.) (recommending that 20% of adjusted gross income should be awarded for support).

b.
Mike was ordered to pay $1,250 per month per child, which is less than 15% of his gross income. Compare with Tedford, 437 So.2d at 423 (where this Court had "no *602 inclination to disturb the Chancellor's decree" since the non-custodial parent was ordered to expend "only 23 percent of his income"). The amount Mike must pay is also substantially less than that which is recommended by statute. MISS. CODE ANN. § 43-19-101 (1989 Supp.) (recommending 25%). And it is less than that which has been ordered by courts in other jurisdictions. See, e.g., Eikenhorst v. Eikenhorst, 746 S.W.2d 882 (Tex. App. 1988) (The father, whose annual income was $250,000, was ordered to pay $3,500 per month for support of two children.); see also Zitter, Excessiveness or Inadequacy of Money Awarded as Child Support, 27 A.L.R.4th 864, at § 20 (1984 & 1989 Supp.).
As noted in the preceding subsection, the chancellor's determination was based upon numerous factors: (1) the Retzers' high standard of living; (2) Mike's substantial yearly income; and (3) a compilation by Nancy of the children's "estimated monthly [living] expenses"  an estimation to which Mike did not object nor dispute. Mike's primary support for his contention that the child-support award is "too high"  i.e., a comparison between the amount of the award and the salaries received by various public officials  is unpersuasive in light of all the evidence and relevant law.
In sum, the chancellor's determination cannot be disturbed unless it is against the overwhelming weight of evidence. See, e.g., Harrell v. Harrell, 231 So.2d 793 (Miss. 1970), and its progeny. Perusal of the record, exhibits, briefs, and relevant case and statutory law in both Mississippi and in other jurisdictions leads this Court to conclude that the chancellor's determination must be affirmed.

C. ISSUE: Whether the Chancellor Erred By Awarding Lump-Sum and Periodic Alimony?

1. Chancellor's Decree and Parties' Contentions
Through her counter-complaint, Nancy requested both lump-sum and periodic alimony. More specifically, she requested an award of "an undivided one-half interest in and to all properties of every kind and description accumulated during the time of marriage." During the hearings, Mike contended that, because he was granted a divorce on the grounds of adultery, Nancy should receive only that which she "legally" owns and nothing more. Mike seems to conveniently forget that he too committed acts of adultery and wears no "white hat." The chancellor's fact-finding is illustrative:
[Mike] also engaged in adulterous affairs in the mid-70's with at least two women and there is evidence that he proposed that one of his employees become his mistress in 1982. There is also evidence that in 1987 and in 1988 since the separation he has had social contact with Eleanor Wright and a woman named Linda, though no adultry [sic] has been proven with these two.
Vol. II, at 198. As related by Nancy:
The problem started in 1979 when Nancy learned about Mike's adultery. Mike was out of the country on a political trip to Brazil in 1979. A female in the community who was then involved in a divorce called Nancy and admitted to her an adulterous relationship with Mike back in 1973-74. Mike was involved as a witness in her divorce. He was subpoenaed but did not testify.
Mike then confessed to Nancy that he had had an on-going affair with their neighbor and Nancy's best friend over a number of months. Mike and this friend engaged in marital misconduct at her residence, his and Nancy's residence and at motels. Mike admitted to another affair with a former employee of R & R. He also testified that he falsely admitted to a third affair as a control measure to see if Nancy disclosed his admissions to other persons in the community.
They filed a joint complaint for divorce on April 1, 1979. While they were separated, Nancy engaged in marital misconduct. Mike found Nancy in a motel room in Jackson with another man (John Doe) on July 10, 1979. Both Nancy and the other party testified that the relationship started during the separation.
Appellee's Brief at 3-4 (citations omitted).
All this aside, the chancellor rejected Mike's contention  "that when the divorce *603 is awarded due to the adultry [sic] of the wife that she is not entitled to any alimony" under Mississippi case law:
Once this was the law in this state, but this Court finds these positions to have been substantially modified by recent cases. In Rainey v. Rainey, 205 So.2d 514, alimony was awarded to the offending wife and the Court said: "The award of alimony under the circumstances was a matter within the sound discretion of the chancellor." In Wood v. Wood, 495 So.2d 503, the Court upheld the award of alimony to the offending wife and said: "The chancery court being sensitive to the equities of the cases before it has the authority to direct payment of alimony even though wrongful conduct on the part of the wife was found sufficient to grant the divorce to the husband."
In Clark v. Clark, 446 [293] So.2d [at] 450, the Court said: "It is the responsibility of an equity court to do what is fair and just when a marriage of many years is dissolved."
In Reeves v. Reeves, 410 So.2d 1300, the Court held that where the wife had materially assisted in the husband's accumulating a great deal of property she was entitled to some share upon dissolution of the marriage. In Watts v. Watts, 466 So.2d 889 [(Miss. 1985)] the Court said:
The sole issue in this case is whether the chancellor was acting beyond his authority in requiring appellant to grant a deed to the appellee of an undivided half interest in 20 acres  The court feels compelled to address the asserted doctrine that the chancery court can not divest a spouse of title to property forcing the spouse to deed it to the other spouse by judicial decree. McRainey [McCraney] v. McRainey [McCraney], 208 Miss. 105, 43 So.2d 872 (1950). While that is the general rule it is not an absolute rule. Our decision here will not create new law, nor overrule any old law, but it will elucidate exceptions to the rule.  The second exception is when the property has been jointly accumulated by the parties and the chancellor makes an equitable division of it.
The Court then went on to say: "When grounds for divorce do lie and there is jointly accumulated property from the marriage, the procurement of which the wife contributed to, the chancellor may effect an equitable division.  A chancellor is not limited to awarding the wife alimony and a share of personalty to a spouse after two decades of marriage."
The Court reaffirmed this authority in Maxie [Maxcy] v. Estate of Maxie [Maxcy], 485 So.2d 1077 ([Miss.]1986) and again addressed it in Dillon v. Dillon, 498 So.2d [328] 330 (1986) and said: "In Mississippi the chancellor is not obligated or required by law to equally divide the property of the parties to a divorce because Mississippi is not a community property state  However, the chancellor does retain the power and authority to affect an equitable division of jointly accumulated personal property acquired during the marriage." See also Schilling v. Schilling, 452 So.2d 834, and Pickens v. Pickens, 490 So.2d 872 [(Miss. 1986)].
In further dealing with this subject the Court in Regan v. Regan, 507 So.2d 54 ([Miss.]1987) said: "Incident to a divorce the chancery court certainly has the power to look behind the formal state of title to property and decree an equitable division of jointly accumulated property, the division to be made by reference to the economic (though not necessarily monetarily economic) contribution made by each to the acquisition and maintenance of the property."
In light of these authorities it is clear that the authority exists for this Court to make an equitable division of the assets. This Court is of the opinion that the facts here support such equitable division of the assets of this marriage. The parties are in disagreement as to who provided the initial funds for acquiring the original McDonald store, but the Court does not think that matters, for in 1973 Mrs. Retzer became the owner of a one-half interest in Retzer and Retzer which was the owner of the franchise. It makes no *604 difference whether she got the stock by gift from her husband as he testified, or by investment of her own funds, for from that point on she was the owner of one-half the corporation. It was that corporation that provided the funds for later acquisition of other assets. It was also that corporation that made it possible for Mr. Retzer to develop Retco and his management company.
The court recognizes the earnings of the corporation were distributed to the owners in the form of salary and bonuses rather than dividends and that this was a substantial tax advantage to them. The Court also recognizes that Retco and the management company were developed as tax saving devices and means for withdrawing corporate profits without the payment of corporate income tax. There is no doubt that had Mrs. Retzer's half interest in the corporation been owned by a totally unrelated party rather than a family member, this type arrangement for distribution of funds would not have been permitted. There is also no doubt that Mrs. Retzer received substantial benefit from the funds that were distributed to Mr. Retzer by way of salary, bonus, and payments to one of his other businesses, for these were the sources of funds that provided her expensive clothes, car, house, trips, and so on.
This Court also recognizes that Mrs. Retzer might have contributed slightly to the accumulation of assets through her labor such as suggestions for decorations, but is of the opinion that her contribution through labor is very insignificant when compared to Mr. Retzer's, while her contribution through capital is significant when compared to his. This Court also is of the opinion that Mrs. Retzer has already received a significant distribution of the earnings of her capital in that this has supported some of her extravagant spending. With these facts, though, the Court concludes that she is entitled to some equitable divisions of the assets accumulated during the marriage, though she is clearly not entitled to half for her contributions have not been equal to his.
In order for the Court to determine what is an equitable division it must be aware of what assets have been accumulated.
Vol. II, at 203-07 (emphasis added). Thus, to help the chancellor determine an accurate assessment of the Retzers' financial status, another hearing was held  after which the following opinion was rendered:
In the earlier opinion the court determined that Mrs. Retzer is entitled to some equitable division of the assets of the parties and cited therein the authorities which supported this determination. The court at that time also determined that Mrs. Retzer was not entitled to one-half the assets in that this state is not a community property state and cited therein the authorities for that determination. The court also there cited cases holding that the fact that Mrs. Retzer was at fault in causing the divorce would not bar her from all support, but that line of cases also indicates fault may be an item for the court to consider. The court has made an effort to determine as best it can the net worth of the parties and after analysis of all the data presented by the parties the court has concluded that these parties together are worth approximately $4,100,000.00. That of this Mr. Retzer holds about $3,000,000.00. The principal asset owned by Mrs. Retzer is her stock in Retzer and Retzer and since she already owns this there has already been some substantial division of the assets accumulated by the parties during the marriage. The court is, however, of the opinion that in light of the accumulations other than Retzer and Retzer that have occurred, that Mrs. Retzer should be entitled to some additional portion of the other assets owned by Mr. Retzer. The court has already determined that he owns about 27% of the net worth of the parties and is of the opinion that an equitable division of the assets here would require a transfer to her of approximately an additional 8%. The court concludes that to accomplish this rather than have him transfer specific assets, it is appropriate that he transfer *605 two specific items as hereinafter mentioned and that he make a cash payment to her as hereinafter provided in the sum of $275,000.00. The court is of the opinion that in light of the financial obligations that are involved with their various assets and with the fact that his management is essential to the success of a substantial portion of the assets, it is not appropriate that the assets themselves be transferred, but that he be directed to transfer cash in lieu of assets to her. In order to avoid undue financial strain on him, the court determines that this $275,000.00 should be paid to her in the following manner: $100,000.00 to be paid November 1, 1988; $75,000.00 to be paid May 1, 1989; and $100,000.00 to be paid May 1, 1990. He is further to pay to her interest at the rate of 8% per annum compounded annually on all sums due after November 1, 1988, with said interest to be computed from November 1, 1988.
The court is further of the opinion that this payment alone will not assure an equitable division of the assets of the parties in light of the fact that the principal asset which Mrs. Retzer now has and which she will have after these payments will continue to be her stock in Retzer and Retzer. Since Mr. Retzer owns approximately 51% of the stock in the corporation, he is in the position to control the corporation and to have all its earnings paid out in salaries to himself or in the position to inequitably erode her asset. The court determines that it must in some manner address this if it is to achieve a fair and reasonable equitable division of the assets. This Court recognizes that Retzer and Retzer is not a party to this lawsuit and that it has no authority over the corporation. The court on the other hand recognizes that it has determined that Mrs. Retzer's interest in the corporation is worth approximately $1,100,000.00, and that she must have some reasonable return on this sum if an equitable division is to be achieved. In light of his being in a position to control the operation of the corporation this court concludes that it must take some action to see that Mr. Retzer handles this matter fairly. This is a unique factual situation insofar as this court can determine from the case law in this state and this court following the mandates of existing case law that it achieve an equitable division of the assets determines that this court of equity must frame some appropriate remedy for this situation. The court concludes that the way to do so is to require him to pay periodic alimony to her if Retzer and Retzer does not provide her with revenue. In seeking to frame this solution the court has attempted to leave him with options available to him to minimize his tax liabilities. The court, therefore, concludes that a fair return on her asset would be 8% and if he uses this asset he should have to pay her such return on it. The court thus finds that he should be required to pay her $88,000.00 per year alimony, less any sums she receives from Retzer and Retzer in the form of compensation, dividends, bonuses, or other benefits. This alimony should be paid to her monthly at the rate of $7,333.33, which will be due on the first day of each month beginning October 1, 1988. Thus, if she receives $2,000.00 per month from the corporation he would have to pay only $5,333.33 per month alimony. If the corporation makes any payments to her in substantial sums, they may serve to reduce his alimony obligations for the ensuing months in an amount equivalent to the amount paid by the corporation. For example, if on January 1, the corporation pays her a $25,000.000 bonus, then for the next three months no alimony would be due and for the next month only $3,000.01 would be due. Thus, she is assured of income for her support. If she receives it from her asset then he would not have to pay her alimony. If her asset does not produce the income, then he would be required to provide it for her in the form of alimony.
This requirement to pay this sum to her shall terminate if she sells her interest in Retzer and Retzer, for then she would have the proceeds of the sale of this substantial asset with which she *606 would be able to fully support herself, and when she has those sums the court determines further alimony would not be required. This alimony requirement should also terminate if she remarries, for at that point this court concludes it would be inappropriate for alimony to be paid or for the court to mandate payment which might be used to support a new husband. If remarriage occurs, she will have to proceed as any other minority stockholder to protect her position in the corporation.
Vol. II, at 230-33. This decision satisfied neither Mike nor Nancy. Both appealed, but Nancy subsequently decided to withdraw her petition and seek an affirmance of the chancellor's award.
Mike seeks a reversal of the award and again contends that he should not be required to pay any alimony to an adulteress. See Appellant's Brief at 1 (citing cases). Mike also contends that, in regard to the award of periodic alimony, the "chancellor has disregarded the corporate structure, `pierced the corporate veil,' and made [him] personally responsible for the corporation. Mike concludes that "[t]his may have the appearance of expediency but it is contrary to the most recent statement of this Court." Appellant's Brief at 35-36 (citing Gray v. Edgewater Landing, Inc., 541 So.2d 1044 (Miss. 1989)).[3]
Nancy rebuts by pointing out that the chancellor "did not direct R & R to do anything." Instead, "because of the facts peculiar to the case, [the chancellor] held that Mike should pay part of his income to Nancy as a return on her part of the property he controlled and used to make money personally." Nancy finally adds that the "best way to understand the weakness of Mike's position is to assume that the [chancellor] denied any monthly payments ... and left Mike in charge of R & R." "Mike would have control indefinitely of Nancy's income producing assets and keep all profits realized on Nancy's property without paying Nancy anything."

2. Relevant Law and Recommended Disposition

a.
The chancellor's reasoning upon which the alimony award was based is persuasive and fair. More important, the reasoning reflects an accurate assessment and application of relevant, still-valid law. See also Holleman v. Holleman 527 So.2d 90, 94 (Miss. 1988) (holding that chancellors are accorded broad discretion due to their "peculiar opportunity to sense the equities of the situation" before them); Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988) (delineating factors which a chancellor may consider in deciding whether to grant an award).
Before this Court may reverse the chancellor's alimony decree, Mike must have presented sufficient evidence evincing manifest error. Skinner, 509 So.2d at 869; Wood v. Wood, 495 So.2d 503, 507 (Miss. 1986); Tutor v. Tutor, 494 So.2d 362, 364 (Miss. 1986); Harrell v. Harrell, 231 So.2d 793 (Miss. 1970). Restated, Mike had the burden to show: (1) that the alimony award was unwarranted; or (2) that the award should be modified due to unreasonableness. Wood, 495 So.2d at 506 ("We have a long line of cases ... recognizing that, where the parties have been married for a number of years, where the wife is in need of financial support, the chancery court, being sensitive to the equities of the case before it, has authority to direct payment of alimony even though wrongful conduct on the part of the wife was found sufficient to grant the divorce to the husband.") (citing numerous cases); Rainer v. Rainer, *607 393 So.2d 475, 478 (Miss. 1981) (The chancellor's determination must be reasonable and commensurate with the wife's accustomed standard of living  taking into account the wife's own resources and the husband's ability to pay.).

b.
Applying the law to the facts of this case, Mike has clearly failed to meet his burden. Repetitious ramblings about Nancy's adulterous lifestyle are virtually the only evidence presented by Mike to support his contention that alimony is unwarranted; the persuasiveness of these ramblings dims in light of Mike's own adulterous and flirtatious lifestyle. Mike has also failed to show that the award is unreasonable and should be modified. As discussed in a preceding subsection, a "Balance Sheet" indicates that Mike alone is worth over $4 million (probably a conservative figure)  which is over 300% more than Nancy's worth. The chancellor's award of 8% of Mike's worth leaves Mike with over 200% more than Nancy's worth. In other words, before the divorce Nancy owned 27% (approximately $1.1 million) of the Retzers' net worth (approximately $5.1 million according to the "Balance Sheet"). The chancellor awarded Nancy an additional 8% (approximately $685,000). This leaves Mike with 65% (approximately $3.3 million). See White v. White, 557 So.2d 480, 485 (Miss. 1989) (citing two cases: (1) one in which this Court affirmed lump-sum alimony "which represented roughly 33% of her husband's worth," and (2) another in which this Court affirmed "a chancellor's decision making an equal division").
Notably, Mike's dissatisfaction with the award is contradictory to his admission during the divorce hearing that Nancy should receive 50% of that which was accumulated during the marriage:
QUESTION: "You've never considered R & R to be jointly owned by you and Nancy Retzer, have you."
MIKE: "Yes sir. Sir, I gave her half of R & R."
QUESTION: "You intended to give it to her."
MIKE: "I did."
QUESTION: "Well, if you gave it to her, wasn't it hers?"
MIKE: "It was hers after I gave it to her, that's correct."
QUESTION: "Then regardless of what happened after you gave it to her, wasn't half of what R & R made hers?"
MIKE: "That is correct."
Vol. VI, at 618 (As noted previously, R & R comprises the Retzers' seven McDonald's restaurants and is responsible for virtually all the wealth they accumulated during the marriage.).

c.
Finally, Mike's "last-resort" contention  that the chancellor's periodic alimony award "pierced the corporate veil" and, as a consequence, he "disregarded the corporate structure"  is unpersuasive and seems misplaced. That is, the facts of the case sub judice do not seem to fit within the realm of the doctrine's construct.
The doctrine of "piercing the corporate veil" is a judicially-created mechanism used to protect creditors by imposing personal liability on shareholders. See Hodge and Berry, The Model Business Corporation Act: Does the Mississippi Version Lime the Bushes?, 46 MISS.L.J. 371, 376 (1975). More specifically, this doctrine generally applies to two broad categories of cases: (1) Those "in which a third party seeks to hold shareholders individually liable" for corporate debts; and (2) Those in which "a shareholder utilizes a corporation to perform indirectly acts which the shareholder could not legally perform as an individual." Comment, Piercing the Corporate Veil in Louisiana Absent Fraud or Deceit, 48 LA. L.REV. 1229, 1230 (1988). The facts of this case simply do not fit within either of these two broad categories. And as contended by Nancy, the chancellor's decree does not affect the corporation in any way. The decree simply establishes an amount of periodic alimony which Mike must pay Nancy  based upon the Retzers' past earnings  and it permits Mike to offset the alimony payments by the amount which Nancy receives from the corporation in the form of salary, dividends, and so forth. *608 The chancellor's decision accounts for the fact that Mike, as R & R's majority shareholder, could manipulate the corporation's by-laws, policies, or decisions in such a way that would ultimately deplete Nancy's income (which derives almost solely from R & R in salary form).
The chancellor's decree seems fair to both parties. The decree protects Nancy against a majority shareholder who may decide to control the corporation in such a manner that it works a hardship on Nancy's financial status, and it protects Mike against the possibility that he'll have to pay Nancy above and beyond that which the chancellor deemed necessary.
Assuming, arguendo, that the facts are sufficiently analogous and do fall within either of the two categories of cases involving the doctrine, then the question which must be answered is: "Was the chancellor justified in piercing R & R's veil?" This Court answers the question in the affirmative. The chancellor fashioned the periodic alimony award to fit the unique circumstances of the case; he deserves commendation for daring to be innovative. The "design" of the award is equitable and justifiable. Cf. Comment, Corporations and Commercial Law, 49 MISS.L.J. 319, 323-24 (1978) (As a means to rectify a wrong, piercing the corporate veil is justified.); see also Highway Development Co. v. Mississippi State Highway Comm'n, 343 So.2d 477, 480 (Miss. 1977) (holding that a court is justified in piercing the corporate veil where, to do otherwise, would "subvert the ends of justice"); Caroline Transformer Co. v. Anderson, 341 So.2d 1327 (Miss. 1977) (same).

d.
In sum, no manifest error is evidenced. This Court  like the chancellor  is not convinced by Mike's adamant stance that an adulteress deserves nothing while an adulterer deserves all. The chancellor's innovative decision-making is affirmed. If it ultimately works an undue hardship on Mike, then he of course has the option to seek a modification. Moreover, if Mike decides to sell his interest in R & R, then issues not now before this Court may arise and warrant reconsideration and modification of the decree.

III. CONCLUSION
For the foregoing reasons, the chancellor's decree is deemed equitable and is hereby affirmed.
AFFIRMED.
ANDERSON and BLASS, JJ., join this opinion.
NOTES
[1] Mrs. Retzer testified it resumed the last of 1983 or early 1984.
[2] Mr. Retzer testified he would have put Mrs. Retzer's name on the Yazoo City (1983) and Greenville No. 2 (1985) franchise as well, but he was suspecting her of adultery.
[3] The chancellor gave no basis for his conclusion that the situation would be entirely different if Mrs. Retzer's interest had indeed been owned by any investor businessman. The second conclusion, that "her contribution through capital is significant when compared to his[,]" is manifestly wrong. (Emphasis added)
[4] 86 A.L.R.3rd 87 lists a number of states which hold an adulterous wife is not entitled to alimony, 86 A.L.R.3rd 101, § 3, and in those states which allow alimony to an adulterous wife it is to prevent her from being destitute. 86 A.L.R.3rd 104, § 4. Jennings v. Jennings, 464 So.2d 1359 (Fla.App.), review denied 475 So.2d 695 (1985).
[5] One outstanding fact from this record is that throughout their turbulent marriage, both Mr. and Mrs. Retzer have had able legal counsel. Mr. Retzer will be well advised of his trust responsibility, and Mrs. Retzer of her ample avenues of relief in event of any deviation by him.
[6] Indeed, at trial Mrs. Retzer testified Mr. Retzer made no complaint as to her profligacy until they went to court.
[1] Notably, Mike had prepared a false and misleading financial statement which reflected a net worth of only $1.5 million. Vol. II, at 164; Ex. 44 & 46.
[2] Mike's obligation continues until the children are "emancipated or until further [court] order."
[3] Mike also cites Skinner v. Skinner, 509 So.2d 867 (Miss. 1987) in the actual framing of the issue. See Appellant's Brief at 1 ("Can Skinner ... be avoided and a non-party corporation controlled through the guise of alimony on the majority stockholder?"). Mike failed, however, to develop his argument and specifically explain how the chancellor's decision is violative of Skinner. He simply notes that: "If affirmed this will overrule Skinner ... and all prior decisions upholding the integrity of the corporate entity."

This Court in Skinner held that "the chancellor erred in awarding corporate property to appellant where the corporation was in no way made a party to the proceedings." 509 So.2d at 870.