605 So.2d 809 (1992)
Raymond Gibson McEACHERN
v.
Carolyn Poole McEACHERN.
No. 91-CA-0554.
Supreme Court of Mississippi.
August 12, 1992.
*810 V.W. Carmody, Jr., Stanfield Carmody & Coxwell, Jackson, for appellant.
Michael P. Younger, Chapman & Younger, Brandon, for appellee.
Before HAWKINS, P.J., and SULLIVAN and BANKS, JJ.
SULLIVAN, Justice, for the Court:
This case began when the parties divorced in May, 1990. Raymond McEachern was ordered to pay $336.00 child support per month per child (the marriage produced five children) and $320.00 per month in alimony. On November 14, 1990, Raymond McEachern filed a motion for modification of alimony and child support.
*811 After hearing the motion, the chancellor found that there had been a material change in circumstances justifying a reduction in the amount of child support and alimony paid by Raymond. Still displeased with the amount he is ordered to pay, Raymond appeals to this Court, assigning the following as error:
1. The Chancellor erred in departing from the statutory guidelines for determining the amount of child support;
2. Assuming arguendo that the Chancellor's departure from the guidelines was not error, his award of child support in this case is so excessive as to constitute an abuse of discretion and is therefore manifestly wrong; and
3. The Chancellor's award of alimony is so excessive in this case as to constitute an abuse of discretion and is therefore manifestly wrong.
The marriage of Raymond and Carolyn McEachern, which ended in divorce on May 14, 1990, produced five (5) children, who ranged in age from six to seventeen at the time of this hearing. At the time of the divorce, Raymond was ordered to pay child support in the amount of $336.00 per child per month and alimony in the amount of $320.00 per month for a total of $2,000.00 per month. At the time, Raymond was in debt to the tune of half a million dollars.
Raymond subsequently filed bankruptcy, discharging a debt to his brother of $30,000.00 and one to his parents of $40,000.00. The total debt discharged by his bankruptcy was $519,377.29. Carolyn was left with some debts by virtue of Raymond's bankruptcy. Raymond testified that he thought his bankruptcy may have resulted in debt in the neighborhood of $20,000.00 for Carolyn.
Raymond previously owned Delta Copy Products. He testified that after his personal bankruptcy, he sold assets of Delta Copy and put the proceeds ($30,000.00) into Capital Copy Products, Inc., another Mississippi corporation which was formed in August, 1990, and owned by his brother. Contradicting himself, Raymond then stated that his brother paid him $30,000.00 for the assets of Delta Copy and transferred them to his new corporation. He could not say what he did with the $30,000.00 he received from his brother. Some assets of Delta Copy were taken by Deposit Guaranty Bank pursuant to foreclosure.
Raymond had been employed by Direct Mail Computer Services since March 1, 1991, and was still employed there. His gross pay was $2,000.00 per month. Although holding a commission position, Raymond expected it would be over a year before his income increased. The successor to Raymond's former company, Capital Copy, continued to pay medical insurance for his family, at a cost of $367.00 monthly. Raymond's expenses, other than child support and alimony, totaled $1,815.00. However, of that amount, $300.00 for rent owed to his parents and $500.00 a month for loan repayment to his parents were expenses only on paper as Raymond had not actually paid his parents any amount for either debt. Raymond also listed $300.00 for entertainment, which he stated went to his children when he has them on weekends or to business expenses when he traveled.
Raymond testified that he last received a salary from Capital Copy in March, 1990, and that Capital Copy paid his expenses. However, he admitted that his bankruptcy petition reflected that he received $2,200.00 from Capital Copy in June, 1990, $900.00 in August, 1990, and $800.00 in September, 1990. Further, the bankruptcy petition reflected that Raymond had received $8,377.60 from Delta Copy in January, 1990, $8,377.60 in February, 1990, $12,566.40 in March, 1990, $2,000.00 in June, 1990, $1,500.00 in August, 1990, and $200.00 in September, 1990. So from June, 1990 through September, 1990, Raymond was receiving monies from both companies while in the process of swapping assets from one to the other.
*812 Mrs. C.M. McEachern, Raymond's mother, testified that she had loaned him money since May, 1990, in order to pay Carolyn. In fact, she testified that she had "[m]ostly" paid Raymond's child support since his divorce. However, she stated that checks made out to Carolyn for child support were actually loans to Raymond. Regarding her knowledge of her son's business deals, Mrs. McEachern said she understood that Raymond turned the business over to Frank because he owed Frank money.
Irlene Craig, the bookkeeper for Capital Copy and previously for Delta Copy, testified that she transferred some of the Delta Copy inventory, office equipment, and vehicles to Capital Copy after May, 1990. Although not positive, she said she "tried not to transfer anything that monies was owed on." She further testified that Frank had never had any active involvement in either business and that Raymond was the hands-on manager of both Delta and Capital. Ms. Craig stated that Raymond had received $2,000.00 from Capital in June, 1990, $2,200.00 in July, $2,400.00 in August, $200.00 in September, $3,471.89 in October, part of which was an IRA in the names of Irlene Craig and Delta Copy which Raymond cashed, giving Ms. Craig $1,000.00; $300.00 in November, $800.00 in December, $6,785.51 in January, 1991, approximately $4,400.00 of which was a check received from a contract sold by Raymond which he signed over to his friend Cliff Evans to pay back a loan, and $700.00 in February. This was not in the form of payroll checks, just "monies that he's got out of the company to live on." Raymond had given her expense forms for twelve months of rent at $300.00 a month and some telephone bills, one for approximately $700.00. Ms. Craig said that Raymond ceased his management of the company in March, 1991, when another gentleman came in and started managing Capital Copy. Raymond's W-2 form from Delta Copy showed he made $29,821.58 in 1990, but that was for only three months of the year. His W-2 from Capital copy showed that he made $1,499.94 in 1990, which would include payroll only, not expenses.
Of the five children born to the now defunct marriage of Raymond and Carolyn, Amy, seventeen years old at the time of the hearing, was born autistic. The McEacherns disagreed on how she was at the time of the hearing. Raymond said she is fine, making A's and B's in school. According to Carolyn's testimony Amy made A's, B's, C's, and D's. Carolyn said that although she's made a lot of progress and hasn't been in treatment for about eight or ten years, she can't relate to other children and is very depressed. She would be incapable of taking care of her younger siblings during the summer because of her depression. Some type of special treatment was becoming necessary, according to Carolyn, and she has been discussing this with her boyfriend's brother, a psychologist.
Carolyn McEachern testified that the five children have lived with her since the divorce, first in an apartment and now in a house she is buying, the payments on which are less than the previous apartment rent. She went to work after the divorce and earned a $1,000.00 salary plus commission each month. Carolyn testified that she grossed between $1,700.00 and $2,000.00 a month. Carolyn further stated that she was unaware of Raymond's income from Capital Copy for 1990 and 1991 as testified to at this hearing. In addition to the monthly expenses listed on her financial declaration, which total $3,196.40, she expected to incur full-time child care expenses for the summer months since she was working. As stated above, Carolyn believed Amy was not capable of caring for the other children and she stated that the twelve year old is busy and perhaps not ready for such a lot of responsibility. She was also unable to pay her lawyer for his time spent on this matter. Carolyn testified that if her support is cut, she would not be able to afford to raise the children.
Raymond's child support and alimony payments of $2,000.00 a month were based on his salary prior to March, 1990, when he *813 made anywhere from $7,500.00 to $12,000.00 a month. As his gross salary is now $2,000.00 a month, he requested a reduction as per the locally accepted guidelines or those set out in the Code.

I.

WHETHER THE CHANCELLOR ERRED IN DEPARTING FROM THE STATUTORY GUIDELINES FOR DETERMINING THE AMOUNT OF CHILD SUPPORT.
Chancery courts may modify final decrees which pertain to child support. This authority exists by statute as well as by virtue of the inherent power of the chancery court. Campbell v. Campbell, 357 So.2d 129, 130 (Miss. 1978); Mississippi Code Annotated 93-5-23 (Supp. 1991). The burden of proof that must be met by the party seeking a financial modification is to show a material change of circumstances of one or more of the interested parties, whether it be the father, mother, or the child(ren), arising subsequent to the original decree. Cox v. Moulds, 490 So.2d 866, 869 (Miss. 1986); Adams v. Adams, 467 So.2d 211, 214 (Miss. 1985). Elements to be considered are (1) increased needs of children due to advanced age and maturity, (2) increase in expenses, (3) inflation, (4) relative financial condition and earning capacity of the parties, (5) health and special medical needs of the child, both physical and psychological, (6) health and special medical needs of the parents, both physical and psychological, (7) necessary living expenses of the father, (8) estimated amount of income taxes each party must pay on his income, (9) free use of residence, furnishings, and automobile, and (10) other facts and circumstances bearing on the support as shown by the evidence. Id. at 215. A standard of living beyond the father's financial ability to provide cannot be imposed upon him. Id. Although the statutory guidelines for child support work as a rebuttable presumption, in modifying an award of child support the chancellor cannot apply the guidelines to the exclusion of the individual factors affecting former spouses and their child(ren). Thurman v. Thurman, 559 So.2d 1014, 1017 (Miss. 1990).
The Chancellor found that, despite his lack of candor and apparent attempt to conceal that he had collected expense monies, Raymond met his burden of proof by showing a material change of circumstances arising subsequent to the original decree by virtue of bankruptcy and corporation law. Basically, the financial condition and earning capacity of Raymond and his necessary living expenses were the factors supportive of financial change. Although Raymond had collected expenses from both Delta and Capital Copy, the chancellor found that Raymond's adjusted gross income is now $1,535.00 a month. Further, he found Raymond's expenses to be $1,015.00, but disallowed $300.00 of these expenses, for entertainment, as unreasonable. (The chancellor did not include in this expense figure the $500.00 a month for repayment to his parents or the $300.00 a month rent to his parents, as it did not seem necessary that Raymond begin paying these amounts at this time.) As Raymond ceased collecting expense money from either Delta or Capital in February of 1991 and went to work for Direct Mail in March of 1991, where he began receiving a regular salary, these findings are supported by substantial evidence in the record. Therefore, this Court will not disturb the chancellor's conclusions.
Subtracting from Raymond's monthly income of $1,535.00 his expenses of $715.00, he is left with $820.00 per month. The original amount of child support, $1,680.00 a month, obviously cannot be imposed upon him as it is beyond his financial ability to provide that amount. We must now look to the guidelines provided by Miss. Code Ann. § 43-19-101 (Supp. 1991). For five or more children, the guidelines call for twenty-six percent (26%) of the adjusted gross income to be awarded for child support. In Raymond's case that is approximately *814 $398.00 a month. However, the guidelines may not determine the specific amount of support required. This is a job for the chancellor, who has special knowledge of the actual circumstances. Thurman, 559 So.2d at 1018.
The chancellor who heard all of the evidence in this case determined that child support in the monthly amount of $750.00 was appropriate. This breaks down to $150.00 per child per month. Additionally, the amount of support is to increase when Raymond's income reaches $3,600.00 per month. This
judicial award making a written or a specific finding different from the guidelines defeats the presumption and leaves, as this court believes the Legislature intended in the normal case, child support determination in the hands of the customary chancery court proceeding.
Id. at 1017. Additionally, the chancellor followed the statutory method of rebutting the presumption that twenty-six percent of Raymond's adjusted gross income was the appropriate amount of child support: the record includes a written finding that the guidelines are inappropriate in this particular case. Miss. Code Ann. § 43-19-103 (Supp. 1991).
The fact that the chancellor departed from the statutory guidelines in determining the amount of child support was not error.

II.

ASSUMING ARGUENDO THAT THE CHANCELLOR'S DEPARTURE FROM THE GUIDELINES WAS NOT ERROR, WHETHER THE AWARD OF CHILD SUPPORT IN THIS CASE IS SO EXCESSIVE AS TO CONSTITUTE AN ABUSE OF DISCRETION AND IS THEREFORE MANIFESTLY WRONG.
An award of child support is within the chancellor's discretion and will not be disturbed by this Court unless the chancellor was manifestly in error in his finding of fact and manifestly abused his discretion. Smith v. Smith, 585 So.2d 750, 753 (Miss. 1991); Powers v. Powers, 568 So.2d 255, 257-58 (Miss. 1990). See also Miss. Code Ann. § 93-5-23 (Supp. 1991).
Although we have child support award guidelines in our Code [Miss. Code Ann. § 43-19-101 (Supp. 1991)], they are mere guidelines and do not control the chancellor's award of child support. Thurman, 559 So.2d at 1017-18. See also Jellenc v. Jellenc, 567 So.2d 847 (Miss. 1990). The rebuttable presumption of the appropriateness of an award pursuant to these guidelines may be overcome by an award or modification of child support that does not comply with the guidelines or by making a written finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case. Thurman, 559 So.2d at 1017; Miss. Code Ann. § 43-19-103 (Supp. 1991).
When entering a child support decree, the chancellor should consider all circumstances relevant to the needs of the children and the capacities of the parents. The reasonable needs of the children are obviously the beginning point in such inquiry. There is always some minimum level of food, clothing, shelter, day care, education, medical care and the like that must be provided. Above that, what is reasonable turns on the circumstances  and one of the major circumstances is the financial resources reasonably available to each parent.
Dudley v. Light, 586 So.2d 155, 162 (Miss. 1991), quoting Tedford v. Dempsey, 437 So.2d 410, 422 (Miss. 1983).
Standing alone the chancellor's award of child support was not an abuse of discretion. But, when considered with the alimony award and the income of the father, we are of the opinion the chancellor abused his discretion and we reverse and remand for a new hearing on the issue of child support and alimony. Smith v. Smith, 585 So.2d 750, 753 (Miss. 1991); Powers v. Powers, 568 So.2d 255, 257-58 (Miss. 1990).

*815 III.

WHETHER THE CHANCELLOR'S AWARD OF ALIMONY IS SO EXCESSIVE IN THIS CASE AS TO CONSTITUTE AN ABUSE OF DISCRETION AND IS THEREFORE MANIFESTLY WRONG.
Whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor. Cherry v. Cherry, 593 So.2d 13, 19 (Miss. 1991). The chancellor should consider the reasonable needs of the wife and the husband's right to lead a normal life with a decent standard of living. Gray v. Gray, 562 So.2d 79, 83 (Miss. 1990).
No legal arguments regarding alimony were made at the hearing and the chancellor simply reduced alimony to the same extent that the child support had been reduced. From the totality of the circumstances on this record the chancellor's reduction of alimony without applying any standard was an abuse of discretion.
Based on the testimony in the record of the monthly net spendable income of Raymond and the amount of child support awarded, an award of $150.00 per month alimony exceeds the remaining funds on hand. This is clearly an abuse of discretion and the alimony award is reversed and remanded with the child support award for a new hearing.
The chancellor's modification of support and alimony is reversed and this cause is remanded to the Chancery Court of Rankin County for a new trial.
REVERSED AND REMANDED TO THE CHANCERY COURT OF RANKIN COUNTY, MISSISSIPPI, FOR A NEW TRIAL.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, PITTMAN, BANKS and McRAE, JJ., concur.