641 So.2d 734 (1994)
Ronald E. GROGAN,
v.
Carolyn Tate GROGAN.
No. 92-CA-00331.
Supreme Court of Mississippi.
June 9, 1994.
Rehearing Denied September 15, 1994.
*736 Ross R. Barnett, Jr., Barnett Law Firm, Thomas J. Lowe, Jr., Jackson, for appellant.
Richard C. Roberts, III, Jackson, for appellee.
EN BANC.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION.
This case is appealed from the Chancery Court of Hinds County, First Judicial District. Following a two-day trial on January 14-15, 1992, the chancellor awarded Carolyn Tate Grogan a divorce from her husband, Ronald E. Grogan, on the ground of uncondoned adultery. A final judgment in this case was entered on February 5, 1992. Among other things, this final judgment required Ronald to pay to Carolyn $600 per month in child support ($300 per child), $25,020 lump sum alimony (payable in sixty $417 monthly payments), and also awarded Carolyn partial attorney's fees in the amount of $15,000. From this ruling, Ronald appeals to this Court assigning as error the following:
I. WHETHER OR NOT THE CHANCELLOR ABUSED HER DISCRETION AND COMMITTED MANIFEST ERROR IN THE DETERMINATION IN THE AMOUNT OF THE AWARD OF CHILD SUPPORT.
II. WHETHER OR NOT THE CHANCELLOR ABUSED HER DISCRETION AND COMMITTED MANIFEST ERROR IN THE AWARDING AND DETERMINATION IN THE AMOUNT OF THE AWARD OF ALIMONY.
III. WHETHER OR NOT THE CHANCELLOR ABUSED HER DISCRETION AND COMMITTED MANIFEST ERROR IN AWARDING AND THE DETERMINATION OF THE AMOUNT OF THE AWARD OF ATTORNEY'S FEES.

II. STATEMENT OF THE FACTS.
Ronald E. Grogan and Carolyn Tate Grogan were married on August 6, 1973. Ronald and Carolyn had two children, Ronald Wade Grogan and Heather A. Grogan, who were ages 17 and 9 respectively at the time of the trial.
After they were married, when she was 20, Carolyn went to work for Audubon Insurance Company. At Audubon, she began as a receptionist, but later worked in the company's commercial underwriting department. Carolyn worked there for five and one half years.
In 1982, Ronald bought a commercial charter bus operation, Deep South Buses, from his father. Carolyn quit her job at the insurance company and went to work for Ronald full time at Deep South where she did not make a salary. In 1984, Ronald bought a travel agency called American Adventure Travel, which dealt with charter bus tours and individual travel arraignments. After about six months Carolyn went to work at American Adventure Travel on a full time basis. Carolyn worked there eight hours a day, five days a week and drew no salary for her work. Ronald and Carolyn would take a draw out of the company and would then deposit this in their joint checking account. Carolyn testified that this draw averaged about $4,000 per month. With the amount drawn on the company and deposited in their joint checking account, Carolyn would pay their bills. However, only home expenses such as the house note, utilities, groceries, and school notes were paid out of this joint checking account. Other expenses, including car notes, car insurance, car tags, and fuel, were paid each month by the company. *737 Also, the company paid the premium for the family's health, medical, and cancer insurance policies. Carolyn has only a high school education, and she testified that her only work skills are those that she developed while working in the travel industry.
Ronald was the sole shareholder and also the president of American Adventure Travel. While Carolyn did not own any stock in American Adventure Travel, she did serve as the company's secretary and treasurer. In her capacity as secretary and treasurer, Carolyn signed documents as an officer of American Adventure Travel, and also signed continuing guarantees of indebtedness of the corporation. In addition to serving as secretary and treasurer, Carolyn made several other significant contributions to American Adventure Travel. When Ronald and Carolyn sold their home, Carolyn deposited her half of their home equity ($6,000) into American Adventure Travel's account. Carolyn took a $4,000 cash advance on her personal Visa Classic Account and deposited this in the company's account. Also, at Ronald's request, Carolyn purchased a computer for American Adventure Travel from Office Depot on her Citibank Visa charge card.[1]
While the family did live a "comfortable" lifestyle, the company did on occasion experience a cash flow problem. To help relieve this situation Ronald requested that Carolyn ask her parents about possibly lending them some money. Carolyn did, and her father, J.N. Tate, agreed to lend them $20,000. To get this money, Mr. Tate took out a home equity loan for which he had already been approved. Mr. Tate gave the money to Carolyn in cash and she deposited it into American Adventure Travel's account. The amount of repayment on this loan was $418 per month. Ronald would authorize a check from the company for that amount in Carolyn's name. Carolyn would deposit this check into their joint checking account and would then write her parents a check from this account.[2]
Ronald and Carolyn separated on November 6, 1990, when Ronald left home. Ronald said that he needed some time alone and that it was not Carolyn's fault. Carolyn testified that after Ronald left home, she tried to get him to return, but with no success. After the separation, Carolyn continued to work with Ronald at American Adventure Travel until December 1990. She left because of the strain between her and Ronald and because she said that Ronald asked her to leave. Ronald then got Carolyn a job at Cline Tours. She worked there on a commission basis, where she would get one half of all that she sold, with the owner getting the other half. Carolyn testified that when she told Ronald that she and the children could not live off of the commission that she would make at Cline Tours, Ronald told her not to worry and that he would take care of them. Following the separation, Ronald began paying himself a salary of $3,000 per month at American Adventure Travel. His take-home pay was approximately $2,200.
In April of 1991, Ronald admitted to Carolyn that he was having an affair with Angela Jones. Carolyn testified that after she learned of this affair, Ronald told her that he would give her $1,000 per month to support her and the children. Carolyn filed suit for separate maintenance, child custody, and support on May 28, 1991, because she stated the $1,000 from Ronald and her commissions from Cline Tours of approximately $650 per month were inadequate to support her and the children. In his answer to this complaint, Ronald counterclaimed for divorce on the grounds of cruel and inhuman treatment and irreconcilable differences.
On June 11, 1991, a hearing was held on Carolyn's Request for Temporary Relief. Among other things, this Temporary Order, entered on June 24, 1991, awarded custody of the children to Carolyn, required Ronald to pay to Carolyn $750 per month in child support ($375 per child), and $750 separate maintenance. Also, Ronald had to make payments *738 to Mr. J.N. Tate, Carolyn's father, of $418 in repayment of the loan, provided that Ronald was able to do so.
After this temporary order, on July 1, 1991, Ronald transferred the assets of American Adventure Travel into Grogan Coaches, Inc., a corporation formed by Ronald. Carolyn then made a Motion for Citation for Contempt. A hearing was held on this motion on July, 29, 1991. At this hearing the chancellor found Ronald to be in contempt in the amount of $1,363 in that he had the ability to pay, but had failed to do so. The chancellor also awarded Carolyn $400 in attorney's fees. Ronald was ordered into the custody of the Hinds County Sheriff's Department until he purged himself of this contempt. However, the incarceration was stayed until July 31, 1991, in order to give Ronald time to raise this money.
On the day following the contempt hearing, July 30, 1991, Ronald sold his two corporations, American Adventure Travel and Grogan Coaches[3] to his brother Chris Grogan for a total of $3,000.[4] Ronald testified at a later hearing that he sold his corporations because he was about to go to jail as a result of his inability to pay the contempt judgment and that he did so with no malice toward Carolyn or his children. Ronald also testified that Carolyn had made threats to him to the effect that before she was through with him, both he and his corporations would be broke. There is also a considerable amount of dispute as to whether Carolyn was offered the opportunity to buy the companies. Ronald testified that he offered to give the companies to Carolyn and that she refused to take them. While Carolyn admits that Ronald did make this offer, she claims that this was not a legitimate offer because it was made in a "flipped way" and was made during the course of a heated argument.
Chris testified at trial that he bought the corporations only to keep his job and to help support his family. He did not buy the corporations with the intention to either help his brother, Ronald, or to hurt Carolyn. When he made this purchase, Chris did not know what the companies' assets or liabilities were nor did he review any financial statements. Chris did admit that Ronald told him about Carolyn's credit card cash advance and her purchase of the computer, and that the corporations should be responsible for those amounts. Chris also testified that even after the sale, the corporations have continued to pay some of Ronald's debts. These included a $430.48 per month note to George Fisher for Ronald's purchase of P & G Charter and a number of other expenses.
This sale of the corporations to Chris Grogan took place the night before a Temporary Restraining Order went into effect. This TRO, which went into effect at 11:30 a.m. on July 31, 1991, prevented Ronald E. Grogan, and those persons in active concert with him from taking any action whatsoever to sell, transfer or convey, or otherwise dispose of or liquidate the stock or assets of American Adventure Travel, Inc. or the stock or assets of Grogan Coaches, Inc. This TRO was later amended to prohibit all officers, agents, servants, employees and attorneys of these two companies from disposing of the stock or assets of these companies without permission of the court and also to prohibit the paying of any non-routine business expenses in excess of $500 without permission of the court.
Following the court's granting of the Temporary Order, Carolyn started working for Travel Service International, Inc. Her monthly salary at Travel Service International was $1,500, which was a sizable increase from her prior employment.
As a result of these changed circumstances, (Ronald's selling of the corporations and Carolyn's new increased salary), Ronald made a Motion to Modify the Temporary Order on August 5, 1991. Prior to the hearing on his motion to modify, Ronald accepted a job in Houston, Texas, with American Student *739 Travel that was to begin in September 1991. At the hearing, Ronald testified that his salary was to be $35,000 per year or $2,917 per month. American Student Travel was Ronald's largest account at American Adventure Travel. American Student Travel provided Ronald's company with approximately $500,000 per year in business of which American Adventure Travel made about a ten percent profit. Ronald was to do for American Student Travel in Houston what he had formerly done for it in Jackson.
The hearing on Ronald's motion to modify was held on August 27, 1991. The chancellor's ruling reduced the amount of separate maintenance that Ronald was required to pay Carolyn from $750 per month to $450 per month. All other relevant provisions of the original order remained intact.
Following this ruling, Ronald did in fact move to Houston, Texas, and began working for American Student Travel. In Houston, Ronald lived with his girlfriend, Angela Jones. According to Angela's ex-husband, Angela and her two and a half year old son, Taylor, still lived with Ronald at the time of the trial. Ronald testified at a later contempt hearing that he paid Angela's rent and utilities, but that she bought her own food.
Carolyn filed another Motion for Citation for Contempt on September 20, 1991, again claiming that Ronald was in arrears on his child support and separate maintenance payments. A hearing was held on this motion on October 1, 1991. The chancellor again found Ronald in contempt in the amount of $3,885.92 and also awarded Carolyn $350 in attorney's fees. Ronald was ordered into the custody of the Hinds County Sheriff until such time as he purged himself in the amount of $1,000.
On November 20, 1991, Carolyn filed a Motion for Leave to File an Amended Complaint and to Add New Defendants, which was granted on November 21. In her amended complaint, Carolyn sought a divorce from Ronald on the grounds of wilful, continued and obstinate desertion, and adultery. She also added Chris Grogan, American Adventure Travel, and Grogan Coaches as defendants. Carolyn claimed that Ronald and his brother, Chris, acted in concert in a scheme to place the assets of his wholly owned corporations, which were acquired in part through her labor and capital contributions, beyond her reach in this divorce action. Carolyn once again amended her complaint to assert additional jurisdictional facts on January 13, 1992.
Carolyn's attorney noticed Ronald that his deposition was to be taken. Also, pursuant to Rule 34 of the Mississippi Rules of Civil Procedure, Ronald was requested to produce several documents. Ronald did not attend his deposition nor did he produce the documents requested. Accordingly, Carolyn filed a Motion for Sanctions against Ronald. This motion was granted and was made part of the final judgment of the chancellor.
Approximately two weeks prior to trial, Carolyn accepted a new job with International Tours of Clinton where she worked as a travel agent. She was paid a salary twice a month there. Carolyn testified that her gross pay was $1,400 per month and that her net pay was around $1,168 per month.
On January 2, 1992, Carolyn filed her third Motion for Citation for Contempt against Ronald. The chancellor granted this motion and made it a part of the final judgment.
The divorce and contempt cases were tried on January 14-15, 1992. Ronald chose not to appear at this trial, but was represented at trial by counsel. At the conclusion of all evidence, the chancellor rendered a bench opinion, followed by a written final judgment which was filed on February 5, 1992. Ronald was found to be in contempt in the amount of $8,655.89 and was ordered to be incarcerated until he purged himself of this contempt. Among other things this final judgment granted Carolyn a divorce on the ground of uncondoned adultery. Carolyn was given custody of the two children, with Ronald having visitation rights. The judgment ordered Ronald to pay $600 per month ($300 per child) in child support. He was also ordered to pay Carolyn $25,020 in lump sum alimony. This amount is to be payable in 60 monthly payments of $417. Ronald was to pay all costs incurred in this action and also to pay Carolyn $15,000 as a partial attorney's fee. Finally, the corporate defendants, *740 American Adventure Travel and Grogan Coaches were ordered to pay the outstanding balances on Carolyn's Visa Classic and Citibank Visa accounts.[5]

III. ANALYSIS.

I. WHETHER OR NOT THE CHANCELLOR ABUSED HER DISCRETION AND COMMITTED MANIFEST ERROR IN THE DETERMINATION IN THE AMOUNT OF THE AWARD OF CHILD SUPPORT.

A. Parties' Contentions.
Ronald contends that the chancellor's award of $600 per month ($300 per child) was error. This amount represents 27.5% of Ronald's take home pay. Ronald argues that this is clearly in excess of the statutory guidelines and that the award was not based upon the evidence that was before the court. Carolyn counters this argument by asserting that the statutory guidelines are merely suggested guidelines and that there is substantial evidence to uphold the award of the chancellor.

B. Applicable Law.
The first matter that must be resolved in this determination is whether the chancellor erred in deviating from the statutory guidelines codified at Miss. Code Ann. § 43-19-101 (1972). This code section establishes guidelines which "shall be a rebuttable presumption in all judicial or administrative proceedings regarding the awarding or modifying of child support awards in this state." For an award supporting two children this section uses as the guideline 20% of the payor's adjusted gross income. Miss. Code Ann. § 43-19-101(1) (1972). In the instant case, Ronald testified that his starting salary was $35,000 per year with a take home pay, after taxes and deductions, of $2,176.68 per month. An obligation of $600 per month in child support would represent 27.5% of Ronald's adjusted gross income, or 7.5% greater than the percentage suggested by the statute.
Application of these guidelines can be circumvented by the awarding body making "a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case ..." Miss. Code Ann. § 43-19-101(2) (1972). See also Miss. Code Ann. § 43-19-103 (1972). This Court has stated:
Suffice it to say a judicial award making a written or a specific finding different from the guidelines defeats the presumption and leaves, as this Court believes the Legislature intended in the normal case, child support determination in the hands of the customary chancery court proceeding. Certainly the guidelines are relevant and may be considered by a chancellor as an aid, but the guidelines may not determine the specific need or the specific support required. This is to be done by a chancellor at a time real, on a scene certain, and with a knowledge special to the actual circumstances and to the individual child or children.
Thurman v. Thurman, 559 So.2d 1014, 1017-18 (Miss. 1990). See also Dunn v. Dunn, 609 So.2d 1277, 1285 (Miss. 1992); McEachern v. McEachern, 605 So.2d 809, 814 (Miss. 1992); Hammett v. Woods, 602 So.2d 825, 828 (Miss. 1992); Gillespie v. Gillespie, 594 So.2d 620, 623 (Miss. 1992); Smith v. Smith, 585 So.2d 750, 753 (Miss. 1991).
In the instant case, the chancellor stated her reasons for not applying the statutory guidelines in the final written judgment with the following language:
In determining the amount of child support to be paid by the Defendant, Ronald E. Grogan, this Court has deviated from the statutory guidelines for the reasons set forth in the Court's bench opinion. Specifically, there is considerable question as to the actual earnings of the Defendant, Ronald E. Grogan, and based upon the credibility of the witnesses, Ronald E. Grogan's previous testimony in this Court, and the circumstances surrounding his current employment with American Student Travel, the Court finds that the sum of $300.00 per *741 month, per child, is reasonable and necessary for the support and maintenance of the minor children.
The chancellor followed the required method of rebutting this statutory presumption, and committed no error in departing from these guidelines.
Next, consideration must be given to whether the chancellor erred in the amount of child support awarded. The awarding of child support is within the sound discretion of the chancellor. This Court has on numerous occasions held that it will not disturb a chancellor's determination of child support "unless the chancellor was manifestly in error in his finding of fact and manifestly abused his discretion." McEachern, 605 So.2d at 814; Smith, 585 So.2d at 753; Powers v. Powers, 568 So.2d 255, 257-58 (Miss. 1990). See Miss. Code Ann. § 93-5-23 (Supp. 1993). Also, "The process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court's review." Gillespie, 594 So.2d at 622 (citing Cupit v. Cupit, 559 So.2d 1035, 1036-37 (Miss. 1990)).
In reviewing the evidence in the record it seems clear that there was sufficient evidence to support the chancellor's consideration of these factors. Carolyn testified that two weeks prior to the trial she accepted a new job with International Tours of Clinton. Carolyn's monthly take home pay from her new job per month was $1,168. Also, International Tours of Clinton would pay Carolyn's medical insurance, but not the children's, after she had worked there for three months. While Carolyn had increased her salary with this new job, her earning potential was still limited because Carolyn had only a high school education and her only work skills were those she acquired by working in the travel industry. To help her cash flow problems Carolyn for a while took in a boarder who paid her $200 per month, although she did have to provide this boarder with food. Also, to help supplement the family's income, Ronald Wade Grogan, Ronald and Carolyn's 17 year-old son, took a job and Carolyn borrowed money from her parents. Prior to their separation, the family's monthly expenses were $4,000 per month, not including expenses paid by the company. Evidence introduced at trial showed that Carolyn's and the children's monthly expenses were $2,225 per month. Carolyn testified that in order to try to save money, she had cut expenses by no longer receiving the newspaper, limiting cable television service, and giving up renter's insurance.
Carolyn was placed in a much more difficult position in trying to prove Ronald's living expenses and his earning capacity because of his failure to appear at his duly scheduled deposition and at the trial. It is evident from the chancellor's bench opinion and her written final judgment that she was very skeptical of Ronald's true earnings. Following the sale of his corporations to his brother, Chris, Ronald moved to Houston, Texas, with his girlfriend, Angela Jones. There Ronald began working for American Student Travel. American Student Travel was the largest client of American Adventure Travel. This one client alone provided Ronald's company with about $500,000 worth of business. From this amount his company made about a ten percent profit. In fact, Carolyn testified that Ronald told her on a number of occasions that the family could live comfortably off of that one account. Though as a client, American Student Travel provided Ronald's company with approximately $50,000 net income each year, he accepted a job with this company in Houston for $35,000 per year. Ronald's take home pay every month was $2,176.68. At the contempt hearing held on October 1, 1991, Ronald introduced into evidence a document listing his living expenses in Houston. His expenses for the month represented by this document were $2,062.44. This listing included such expenses as all of his credit cards and an amount for his truck tag.
Again, the chancellor had reservations as to Ronald's actual earnings. Her theory that Ronald may have had some undisclosed sources of income is supported by evidence in the record. Ronald is living in Houston with his girlfriend, Angela Jones, who is unemployed. Ronald admitted that she does not contribute to the payment of their rent or utility bills. Angela's two and a half year-old son, Taylor, lives with them. Angela's ex-husband *742 testified that Ronald pays for Taylor's day care and provides Angela with a vehicle to drive. He also testified that Angela endorses her child support check over to Ronald each month.
Also, when Ronald sold his two corporations, he was still entitled to one monthly paycheck from Grogan Coaches. Although he had earned the money, Ronald waited two weeks before he picked this check up from the company. From such evidence the chancellor could infer that Ronald had some alternate source of support. Also, in addition to his normal monthly salary, Ronald received what could be termed "other income" by virtue of the fact that the corporations that he sold to Chris still paid a $430.48 personal note of Ronald's to George Fisher each month. Chris further testified that the corporations also still paid other expenses of Ronald's.

C. Conclusion.
Although the chancellor in this case chose not to apply the statutory recommendations and awarded child support in excess of these recommended guidelines, this Court is of the opinion that she was not in error in doing so. In light of the evidence presented to her at trial, a child support award of $600 per month ($300 per child) was not an abuse of her discretion. This reasoning is further enhanced by Ronald's lack of cooperation and candor in these proceedings and the chancellor's skepticism about his true earning potential. Therefore, this Court affirms the chancellor's award of child support in the sum of $600.

II. WHETHER OR NOT THE CHANCELLOR ABUSED HER DISCRETION AND COMMITTED MANIFEST ERROR IN THE AWARDING AND DETERMINATION IN THE AMOUNT OF THE AWARD OF ALIMONY.

A. Parties' Contentions.
Ronald argues in his brief that lump sum alimony is in the nature of a property settlement between the two parties and that lump sum alimony was inappropriate in this case. He also contends that there is no justification in the amount of alimony awarded. Carolyn submits that the award was equitable and just considering all of the facts and circumstances of the case. Further, Carolyn would contend that there was sufficient evidence supporting this finding and that it cannot be said that this award was manifestly wrong.

B. Applicable Law.
In this case, after hearing all of the evidence, the chancellor granted Carolyn an award of lump sum alimony in the amount of $25,020. This sum is to be paid by Ronald in monthly installments of $417 per month for sixty (60) months.
Depending upon the circumstances of the particular case, a chancellor can award lump sum alimony, periodic alimony, or a combination of both. Tilley v. Tilley, 610 So.2d 348, 351 (Miss. 1992). See Jenkins v. Jenkins, 278 So.2d 446, 449 (Miss. 1973). It is also in the discretion of the chancellor to order that lump sum alimony be made in installments. Bowe v. Bowe, 557 So.2d 793, 795 (Miss. 1990); Wray v. Wray, 394 So.2d 1341, 1344-45 (Miss. 1981).
Since this Court's decisions in Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973) and Clark v. Clark, 293 So.2d 447 (Miss. 1974), one or both of two "common threads" appear in all cases in which lump sum alimony is appropriate. Retzer v. Retzer, 578 So.2d 580, 591 (Miss. 1990). The first common characteristic is that the wife's efforts were a material economic benefit to the husband's wealth. These efforts include quitting her job to help him in his business, helping him obtain a college education, working in his business, and providing counseling in the husband's business or investments. Retzer, 578 So.2d at 591. The second factor is being a dutiful and a faithful housewife. Id. It appears that both of these factors are present in the instant case. Carolyn did work for many years in Ronald's business, and there is no indication in the record that she was not a dutiful and faithful wife.
As Mississippi's law on lump sum alimony has developed, four factors have evolved. These four factors were listed in Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988):

*743 1) Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business. Tutor v. Tutor, 494 So.2d 362 (Miss. 1986); Schilling v. Schilling, 452 So.2d 834 (Miss. 1984);
2) A long marriage. Jenkins v. Jenkins, 278 So.2d 446, 449 (Miss. 1973); Tutor and Schilling, supra;

3) Where recipient spouse has no separate income or the separate estate is meager by comparison. Jenkins, Tutor, and Schilling, supra;

4) Without the lump sum award the receiving spouse would lack any financial security. Abshire v. Abshire, 459 So.2d 802, 804 (Miss. 1984).
A closer analysis of these cases, however, reveal that the single most important factor undoubtedly is the disparity of the separate estates.
Cheatham, 537 So.2d at 438. See also Tilley, 610 So.2d at 352; Smith v. Smith, 607 So.2d 122, 126 (Miss. 1992); Cleveland v. Cleveland, 600 So.2d 193, 197 (Miss. 1992); Retzer, 578 So.2d at 592.
It is not disputed that the Grogan marriage was one of long duration. At the time of their separation, they had been married seventeen (17) years and three (3) months. When the divorce became final the length of the marriage was some eighteen (18) years and six (6) months.
It also cannot be disputed that Carolyn played a significant role in the success of Ronald's business enterprise. Carolyn worked for many years for Ronald both at Deep South Buses and at American Adventure Travel without receiving a salary for her services. In fact, Carolyn served as secretary and treasurer of American Adventure Travel. In this capacity, she signed several documents reflecting her position as an officer of the company. Carolyn also signed continuing guarantees of indebtedness of American Adventure Travel. When the couple sold their home, Carolyn deposited her half of their home equity which was $6,000 in the company's account. When American Adventure Travel was having a cash flow problem, Carolyn was instrumental in securing a loan for the company from her parents. Carolyn took a $4,000 cash advance on her Visa Classic credit card and deposited this amount into the company's account. Finally, Carolyn charged a computer for American Adventure Travel on her Citibank Visa credit card.
Also, without this award, Carolyn would lack financial security. Carolyn introduced evidence showing her reasonable expenses for her and the children to be approximately $2,225 per month. Her monthly take home pay was only $1,168 per month. By combining this amount with the $1,017 the chancellor ordered Ronald to pay ($600 child support and $417 alimony), the total is only $2,185 which still falls short of their monthly expenses.
In comparing the incomes of the two parties, Ronald's yearly income is over twice that of Carolyn's. Ronald testified that his starting salary at American Student Travel was $35,000, while Carolyn stated that her gross pay was $1,400 per month which would compute to a yearly salary of $16,800. This is comparing Carolyn's salary with what Ronald admits to making. As noted previously, Ronald is still having some of his expenses paid by the corporations and the chancellor expressed her skepticism as to Ronald's true earning ability.
The only factor which does not favor Carolyn on this issue is the comparison of their separate estates. It seems that at the time of the sale of the corporations, that the companies were not in very good financial condition. Also, it appears from the record that there was not a great disparity between the parties' separate estates because neither Ronald nor Carolyn had an estate of any consequence at the time of the trial. However, Carolyn points to the fact that at the time Ronald asked her to leave American Adventure Travel, the company was doing quite well and had significant assets. Carolyn supported this proposition at trial by introducing into evidence an income and balance sheet of American Adventure Travel for the eight (8) months ending on August 31, 1990, which was only three (3) months before she left the company. This income statement shows American Adventure Travel's net income for *744 the first eight (8) months of 1990 as being $67,272.39. Also, the balance sheet for this time period reveals the company's total assets, after depreciation, of $383,517.91.
Based upon an analysis of the foregoing factors and the facts of this case, this Court holds that the chancellor did not err in awarding Carolyn an award of lump sum alimony. Next, the appropriateness of the amount of the award must be considered.
Whether an award of alimony is warranted and the amount of such an award is within the discretion of the chancellor. McEachern v. McEachern, 605 So.2d 809, 815 (Miss. 1992); Cherry v. Cherry, 593 So.2d 13, 19 (Miss. 1991); Brendel v. Brendel, 566 So.2d 1269, 1272 (Miss. 1990). See also Miss. Code Ann. § 93-5-23 (Supp. 1993). The chancellor's decision will not be overturned unless it is manifestly in error. Smith, 607 So.2d at 125-26; McNally v. McNally, 516 So.2d 499, 501 (Miss. 1987). However, this Court will not hesitate to reverse a decision that is manifestly wrong. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss. 1993); Tilley, 610 So.2d at 351.
Ronald argues that awarding Carolyn an alimony payment in the amount of $417 per month simply reimburses her for the payments on the note to her father. However, the chancellor made it clear in her bench opinion that this was not what she was doing. The chancellor stated:
This Court has specifically excluded the payment of the loan amount that has been testified to to Mr. Grogan and has specifically excluded the loan amount in regard to Mr. Tate, father of Carolyn Grogan.

(Emphasis added).
In her bench opinion the chancellor specifically stated that she looked to "Jenkins and other cases" in determining the appropriate amount to award as alimony. In discussing the appropriate amount of lump sum alimony this Court has stated:
Alimony, if allowed, should be reasonable in amount, commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay.
Gray v. Gray, 562 So.2d 79, 83 (Miss. 1990).
Considering these above factors along with the facts of this case and also taking into consideration the chancellor's strong skepticism regarding Ronald's true earnings and her suspicions concerning the circumstances surrounding his employment with American Student Travel, this Court concludes that such an award was not an abuse of the chancellor's discretion.

C. Conclusion.
This Court finds that the chancellor was not manifestly in error in her award of alimony in this case. Therefore, the chancellor's award of $25,020 in lump sum alimony to Carolyn is affirmed.

III. WHETHER OR NOT THE CHANCELLOR ABUSED HER DISCRETION AND COMMITTED MANIFEST ERROR IN AWARDING AND THE DETERMINATION OF THE AMOUNT OF THE AWARD OF ATTORNEY'S FEES.

A. Parties' Contentions.
The chancellor ordered Ronald to pay Carolyn $15,000 as a partial attorney's fee. It is Ronald's contention that because a large portion of this litigation revolved around the two corporate defendants and Chris Grogan, that it would be unfair to impose this amount of attorney's fee on him. Carolyn argues that her attorney's fees were greatly multiplied by Ronald's actions during these proceedings. These actions include Ronald's failure to obey the court's orders and his refusal to provide the requested discovery which, in turn, made her discovery expenses much higher.

B. Applicable Law.
The decision as to whether to award attorney's fees in a divorce case is within the sound discretion of the chancellor. Adams v. Adams, 591 So.2d 431, 435 (Miss. 1991); Holleman v. Holleman, 527 So.2d 90, 95 (Miss. 1988). This Court will not overturn a chancellor's decision regarding attorney's fees unless the chancellor was manifestly in error. Dunn v. Dunn, 609 So.2d 1277, 1287 *745 (Miss. 1992) (citing Trunzler v. Trunzler, 431 So.2d 1115, 1116 (Miss. 1983)). However, attorney's fees should only compensate for the amount of services actually performed. McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). "It must be fair and just to all concerned after it has been determined that the legal work being compensated was reasonably required and necessary." Id. Ordinarily an award of attorney's fees should not be made unless the party requesting such fees can establish the inability to pay the fees. Dunn, 609 So.2d at 1287 (citing Jones v. Starr, 586 So.2d 788, 792 (Miss. 1991) and Martin v. Martin, 566 So.2d 704, 707 (Miss. 1990)).
At trial, Carolyn introduced into evidence a statement detailing her attorney's fees, totalling $18,957.37. Ronald's attorney stipulated that the amount of Carolyn's attorney's fees was reasonable. Also, Carolyn testified that she was unable to pay these fees and that all the payments that had been made to her attorney were made by her parents.

C. Conclusion.
Based upon the facts presented in this case, this award of attorney's fees was an not abuse of the chancellor's discretion. This is especially true in light of the fact that much of these fees were caused by the actions of Ronald Grogan. Therefore, this Court affirms the chancellor's award of attorney's fees in this case.

IV. FINAL ANALYSIS AND CONCLUSION.
Finding no reversible error in any of the three (3) assignments of error presented on this appeal, this Court affirms.
JUDGMENT IS AFFIRMED.
HAWKINS, C.J., SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
McRAE, J., dissents with separate written Opinion joined by DAN M. LEE, P.J.
McRAE, Justice, dissenting:
The majority affirms awards of lump-sum alimony, child support and attorney fees to Carolyn Grogan which awards appear to have been based on the chancellor's skepticism about the extent of Ronald Grogan's income and assets. While there were, indeed, inferences in the record that Grogan had been less than candid about his finances, Carolyn Grogan did not meet her burden of proof in showing that his income and assets were greater than he claimed. Moreover, she claimed an equitable interest in businesses sold by Grogan to his brother. In bringing these separate corporations into the litigation between the Grogans and allowing Carolyn Grogan to use the divorce court to collect a debt owed to her by those corporations, we are opening the door to chancery intervention in the operation of any business, partnership or professional corporation in a divorce proceeding, all in the name of equitable distribution. Accordingly, I dissent.
After Grogan sold his corporations and moved to Texas, he testified at the hearing on his motion to modify the order granting Carolyn Grogan separate maintenance and other relief that his salary was only $35,000.00 per year, or $2,176.68 per month, after taxes and other deductions. After subtracting an additional $600.00 per month for child support and monthly installments of $417.00 on the $25,020.00 Lump-sum alimony award, it would appear that Grogan is left with only $1059.00 per month to meet his own living expenses. Carolyn Grogan, however, claimed that Grogan's assets were far more substantial, alleging that her former husband and his brother had acted in collusion to place corporate assets beyond her reach. While some of Grogan's business dealings do, indeed, seem somewhat circumspect, Carolyn offers no proof of wrongdoing or even of the existence of hidden assets. She cannot complain that Grogan failed to show up for scheduled hearings or depositions. Pursuant to M.R.C.P. 30(a) and 45(d) and (e), she could have compelled Grogan's presence at both depositions and hearings. He could then have been held in contempt of court for failing to appear. M.R.C.P. 45(f). However, on the basis of Carolyn's unproven allegations, *746 the chancellor made an award which may or may not reflect Grogan's true financial picture. The size of an award cannot be predicated on the basis of the chancellor's skepticism about matters not in evidence. Rather, alimony and child support must be considered together and in light of an accurate picture of the parties' resources.
It would appear that the chancellor partially based the award of lump-sum alimony on the amount of money owed to Carolyn Grogan's father by Grogan or his corporations. While Carolyn may have reaped some of the benefits of that loan, it further appears that Grogan or the corporate entities are charged with the entire debt. Lump-sum alimony is not a repayment of a debt, particularly where the debt owed is to some third party by still another third party. It is up to Carolyn Grogan's father to pursue a separate action against Grogan or the appropriate corporate entity to recover what is owed to him. Likewise, though the issue is not before us on appeal, divorce court is not the place for settling corporate debts. In the court below, Carolyn made the corporations owned by Grogan parties to the divorce. Furthermore, the chancellor ordered them to make payment to her and required that any corporate expenditure in excess of $500.00 be approved by the court. Instead, Carolyn should have maintained a separate action against American Adventure Travel to recover the Visa bills she incurred on behalf of the corporation. These were debts owed to Carolyn by the corporation, not by Ronald and not as part of any "equitable distribution." To allow such an action to be handled as a domestic matter opens the door to interference by the chancellor with other business, partnership or corporate relationships in any divorce proceeding.
Accordingly, because the chancellor's decision is not supported by the evidence in the record, I respectfully dissent.
DAN M. LEE, P.J., joins this Opinion.
NOTES
[1] At the time of the final judgment, the outstanding balances on Carolyn's Citibank Visa charge account and her Visa Classic charge account were $2,080.89 and $4,059.96, respectively.
[2] Carolyn testified that Ronald wanted to follow this repayment procedure so that no one would know the source of the money. She stated that only she, Ronald, and her parents knew about the loan.
[3] Ronald still apparently owns P & G Charters, which is a corporation through which American Adventure Travel and Grogan Coaches maintain their ICC authority to operate a charter bus company. Chris Grogan testified that to the best of his knowledge P & G Charter does not actually exist any longer, the other two companies just run under its ICC authority.
[4] According to Ronald, Chris paid him $1,000 for the stock of Grogan Coaches and $2,000 for the stock of American Adventure Travel.
[5] The corporate defendants did not appeal the paying of the outstanding balances on Carolyn's Visa Classic and Citibank Visa accounts.